# BEAVER COUNTY v. HOME INDEMNITY CO. et al.

No. 5585. Decided July 26, 1935. (52 P. [2d] 435.)

Petition for Rehearing Denied December 5. 1935.

1

2

6

*Cheney, Jensen & Marr,* of Salt Lake City, for appellant.

*Abe Murdock,* of Beaver, *H. Van Dam, Jr.,* of Salt Lake City, and *Randolph S. Collins,* for Beaver County.

*Van Cott, Riter & Farnsworth* and *T. D. Lewis,* all of Salt Lake City, and *Sam Cline,* of Milford, for Samuel Taylor Farnsworth and others.

WOLFE, Justice.

## INDEX.

Issues between Plaintiff and Home Indemnity Co. .................Page 10
Issues between Home Indemnity Co. and Farnsworth ...............Page 30
Issues between Home Indemnity Co. and Individual Defendants ......Page 33
Issues between Malia and Plaintiff ...............................Page 51

This case was tried below on a stipulation of facts. Samuel Taylor Farnsworth took office as county treasurer of Beaver county on January 5, 1931. The Home Indemnity Company, in consideration of an annual premium, became the surety of Farnsworth on his official bond after the county commissioners had, by ordinance, fixed the amount of the bond at $50,000. The bond was thereupon approved by the county commissioners. The pertinent parts of the official bond will be later set out. Between January 5, 1931, and February 23, 1932—the day when the State Bank of Beaver closed its doors—Farnsworth deposited county moneys in said bank in both the checking and the savings departments.

On February 23, 1932, the day on which the bank closed, there was due $60,672.88, plus interest at the rate of 2 per cent, on the checking account amounting to $253.76 and interest at the rate of 4 per cent on the savings account, amounting to $725.33. The largest sum on deposit in the bank at any one time between January 5, 1931, and February 23, 1932, was $111,333.53. This was on December 15, 1931. The smallest amount during this same period was $18,674.78 on October 31, 1931.

The security taken by Farnsworth to secure public moneys on deposit with the Beaver bank consisted of a depositary bond of $5,000 executed by the above named appellant, the Home Indemnity Company, and delivered to Farnsworth on February 28, 1931, for a term of one year. This bond was, by the company, canceled on October 17, 1931. This bond is not the basis of any suit or controversy in this litigation. Another depositary bond for the sum of $25,000 was executed on or about August 18, 1931, by the State Bank

of Beaver as principal, and the defendants, Harris, Yardley, Gunn, Joseph, Tolton, and Thompson as individual sureties. The obligee named in this bond was "The Treasurer of Beaver County." This bond was for the period from August 18, 1931, to January 5, 1935. At the time this bond was delivered, the said Farnsworth and the individual defendants were all directors of the bank, Harris being the president, and they all continued to be such directors until the bank closed its doors. Harris was at said time chairman of the board of county commissioners. The defendant Tolton was the local soliciting agent for the Home Indemnity Company and in conjunction with one Rosenberg, agent for that company in obtaining the official bond of Farnsworth and was paid a portion of the cash commissions earned. After the bank closed its doors, demand was made on the Home Indemnity Company, appellant therein, on account of the official bond. And demand was made on each of the sureties on the individual bond, but all parties have refused and continue to refuse to make any payment to the county.

Beaver county brought suit, as is well expressed in the plaintiff's brief, to recover (a) the sum of $61,651.99, with interest from the State Bank of Beaver County as depositary of public funds; (b) for a like sum from J. A. Malia, bank commissioner of Utah as liquidating agent of the bank; and (c) to impress a trust in favor of the plaintiff for two cash items of $5,211.31 and $4,359.72 and upon certain promissory notes and securities in possession of the bank commissioner; and (d) to recover the sum of $50,000 and accrued interest from the defendants, Farnsworth, and the Home Indemnity Company, appellant herein upon the official bond of the said Farnsworth; and (e) to recover the sum of $25,000, with interest upon the depositary bond executed in favor of the county treasurer by the State Bank of Beaver County and its directors, all defendants herein, and sureties upon said depositary bond.

No motion or demurrer setting up a misjoinder of parties or causes of action was interposed. On the contrary, it was

agreed that the rights of all parties against each other and their priorities should be adjudicated "without further amendment of pleadings" and that such rights should be determined "to the end that if and when plaintiff is fully paid the amount to which each is entitled, each party to this cause who may have contributed to such payment will be informed by judgment and decree herein of the nature and extent of any right of subrogation it may have in the premises." The suit in some of its aspects, therefore, asks for a declaratory judgment.

The trial court awarded judgment (1) in favor of the plaintiff and against the Home Indemnity Company for the full amount of $50,000, plus accrued interest; (2) denying said defendant any right of reimbursement from Farnsworth as principal; (3) denying said appellant, as surety, for the county treasurer, any right of subrogation against the individual sureties on the depositary bond. The appellant, Home Indemnity Company, appealed from this judgment.

The judgment further was in favor of the plaintiff and against the Bank of Beaver and J. A. Malia, etc., for the full amount of public funds of Beaver county which were on deposit in the bank at the time it closed its doors. The decree for the judgment further provided that a certain cash item with certain interest payments and certain promissory notes and securities be declared to be held by Malia as trustee for the plaintiff, and gave the plaintiff the status of a general creditor as to the balance after the application of these funds to the payment of $61,651.99 and interest thereon. Malia cross-appealed from this portion of the judgment.

We shall first consider the issues between the plaintiff and the Home Indemnity Company, and between the Home Indemnity Company and Farnsworth, and next the issues between the Home Indemnity Company and the individual sureties on the depositary bond (subrogation issues), and

lastly the issues between the plaintiff and Malia, as bank commissioner. This last is independent of the issues between the other parties.

The Home Indemnity Company, hereinafter referred to as the appellant, attacks (a) the findings as insufficient to support the judgment; (b) the judgment against the appellant as error; (c) the judgment denying reimbursement against Farnsworth as error; (d) the judgment denying subrogation against the sureties on the depositary bond as error. We shall first consider (b). Was the judgment against the appellant on the official bond of Farnsworth for $50,000 erroneous? The appellant claims the judgment is erroneous because the bond expressly excluded by language liability for loss due to the failure of a bank to pay moneys placed on deposit therein by Farnsworth, the county treasurer. The bond on which appellant is surety, given for the well and faithful performance of Farnsworth's duties is, in this opinion, referred to as the official bond and such surety referred to as the official surety. The bond on which the individual defendants appear as sureties, given by the bank to the treasurer of Beaver county to insure the payment of public moneys deposited in the bank, is, in this opinion, referred to as the depositary bond, and the sureties thereon as the depositary sureties. The plaintiff and the depositary sureties both contend that (1) the official bond should not be construed as evidencing an intention to exclude liability in this case where the treasurer failed to take the security required by section 4500, Compiled Laws of Utah 1917, as amended by Laws 1929, c. 46, and (2) that if the language of the bond is so construed it must, under the statutes of Utah, be held as ineffectual to exempt the appellant from liability. In order clearly to see and discuss these issues, it becomes necessary to set out the pertinent portions of the official bond. The condition and alleged exclusion paragraph of the bond read as follows:

"Now, therefore, the condition of this obligation is such, that if the said Samuel Taylor Farnsworth shall well and faithfully perform

all the duties of his said office, then this obligation to be void, otherwise to remain in full force and effect.

"It is understood and agreed, and this bond is given and accepted on the condition that the Surety shall in no way be held liable for any loss, costs, damages or expenses of any kind caused by the failure of any Bank, Institution or Depository of any kind to pay, deliver over or properly account for any money, moneys, papers, securities or property of any kind placed on deposit therein or in its custody by or for said Samuel Taylor Farnsworth as such Treasurer of Beaver County or in any other capacity."

We are clearly of the opinion that the language used in the bond by its terms and import expresses a clear intention to exclude a liability for loss due to the failure of a bank to pay moneys deposited therein, regardless of whether the money was legally or illegally deposited by the treasurer. The arguments of the plaintiff and depositary sureties run in this wise: The purpose of the official bond is to insure the faithful performance of all the duties of the treasurer, one of which is safely to keep public moneys, and another of which is not to deposit in a bank unless and until the bank gives the security required by amended section 4500, C. L. 1917. This section requires that the depositary bank furnish a surety bond or collateral of a designated class, and if such security is given and the bank fails to pay, the treasurer and his surety are then and only then exempt from liability. Proceeds the argument: The main condition of the bond and the paragraph purporting to exempt the surety must be read together, so as to effectuate the purpose expressed by the condition of the bond; that by holding that the so-called exclusion paragraph meant to exclude liability of the surety only when the treasurer had complied with the provisions of section 4500 harmonizes these two paragraphs and gives effect to the full purpose and condition of the bond to insure the performance of all the duties of a treasurer; further, that the very manner in which the two paragraphs are connected raises an ambiguity which, according to *Walker Realty Co.* v. *Ameri-*

*can Surety Company*, 60 Utah 435, 211 P. 998, must be resolved in favor of the plaintiff.

The appellant pertinently answers to this argument that the law itself would exempt the surety if the funds had been lawfully deposited (section 4500, C. L. 1917, as amended by chapter 46, Session Laws 1929) and that the exclusion clause would, therefore, be purposeless; to which plaintiff replies that the purpose was to invest the appellant with an exemption from liability in case section 4500 was again amended so as to withdraw the legal exemption from the sureties, even in case legal deposits had been made in the bank which subsequently became defunct. To this reply appellant rejoins that the plaintiff is inconsistent in asserting appellant could save itself by an exemption provision from a change in the law and yet not save itself from a present requirement of the law (see hereunder in treatment of the main issue), especially in view of section 4310, C. L. of Utah, 1917, which makes the bonds of civil officers cover duties required by laws passed subsequently to the giving of such bonds. Appellant has the better of the argument in this regard. The construction to be given the language of the bond is obvious. We find no ambiguity; the bond provides that it

"is given and accepted on condition that the surety shall in no way be held liable for any loss * * * caused by the failure of any bank * * * to pay moneys * * * deposited therein by Samuel Taylor Farnsworth * * * as Treasurer of Beaver County or any other capacity."

It is difficult to see how one could state more clearly the simple intention not to be required to pay if the failure of the treasurer to account was due to the failure of a bank in which the funds were deposited to pay. No far-fetched arguments can alter its plain meaning and intent. The case of *School District, etc., v. Aiton*, 173 Minn. 428, 217 N. W. 496, is relied on by respondents as authority to the effect that such limitation applies only to a case where

money is legally deposited. Correctly understood, this case does not so hold. The court construed a like limitation as contained in the present bond as relating only to a legal depositary, i. e., one which had been legally designated by the court as a depositary, and then held the bank which had really been designated, but the designation not filed, to be a de facto depositary. The deposit by the treasurer in such designated depositary (although the designation was not filed) was as to the bondsmen a legal deposit. The limitation clause of the bond was held then to apply to a de facto depositary. The court said that by so construing the limitation clause, there could be no question of the surety's right to contract. It is as if the court had said:

"For the purposes of this case we shall construe the limitation clause most unfavorably to the surety and it still results in the exemption of the surety because the bank is de facto a legal depositary; therefore, there is no need, for the purposes of this case, to construe it otherwise."

This brings us to the main issue which divides the parties. Can the surety on the official bond of a county treasurer in Utah by appropriate language limit its liability on the bond so as to exempt itself from obligation to pay the county for funds which the treasurer fails to "safely keep" because of of the failure of a bank in which the treasurer had illegally deposited the moneys? By the plain language of the bond, appellant intended to exclude liability in such a case. The real question is, Can it or can it not do so under the laws of Utah? Keeping this question in mind for future adversion, another preliminary contention should be disposed of. The plaintiff maintains that the loss against which appellant insured the county was at all events a loss due to the failure of the treasurer to account for public money; that when the failure to account occurred, immediately the liability of the appellant attached; that whatever may lie back of that failure to account, whether the loss was by theft, fire, carelessness, or failure of a bank to pay, is immaterial.

The proximate cause of the county's loss is the treasurer's failure to account or have available the moneys for county expenditures—another form of failure to account. In addition, it is maintained by the depositary sureties that when Farnsworth deposited the moneys in the bank without taking the surety bond or the legal securities required by section 4500, a breach of his duty occurred, and that a cause of action immediately arose in favor of the plaintiff; that at such time the plaintiff might have brought an action for conversion and recovery against Farnsworth, regardless of whether the bank could pay or not. That such action could have been brought ignoring the bank even though it had been perfectly solvent; that what happened after the conversion to make the money inaccessible does not affect the basic right to come against the principal and surety for the conversion; that the failure of a bank was therefore neither the proximate or remote cause of the breach of the official duty because that breach came before the bank failed and was then a fully accrued cause of action for the whole sum converted.

It will be noted that in the first of these propositions the argument is that the breach was the failure to account or to safely keep, and that it is immaterial what caused that failure; that the case of *Salt Lake County* v. *American Surety Co.*, 63 Utah 98, 222 P. 600, 602, held this to be an unqualified duty which was not excusable by showing that the treasurer was free from negligence or fraud; that all that need be shown is that it was not safely kept or that he could not account for it; that the matter of why he could not account or why it was not safely kept is immaterial. The only exception is that the amended section 4500 (amended since the case of *Salt Lake County* v. *American Surety Company* was decided) permits a defense on the part of the treasurer that he deposited it in a bank and took a surety bond or designated class of securities in adequate amount as surety for the bank's failure to pay. The answer to this part of the argument is that the surety, by the language in

the bond, does exclude liability when the treasurer cannot account, or when his failure to safely keep, demonstrated by the depositary's failure, is caused by a failure of the bank to pay the treasurer. The surety by the language in the bond made its exemption from liability depend upon this particular reason why the treasurer could not account or why he did not safely keep. It sought to contract for an exemption if the failure of a depositary bank to pay was the reason why the treasurer could not account, or why he did not safely keep.

The second proposition is that the treasurer, by making an illegal deposit of the money, committed a conversion; that this violation of a duty gave rise to a cause of action, and that it is this cause of action on which the plaintiff is suing, and, consequently, what happened to the money after the conversion is immaterial. In the first place, there is some doubt in our minds whether a deposit not in accord with amended section 4500 is a conversion when the treasurer was not assuming proprietorship over the money or exercising dominion over it inconsistent with the county's ownership. Conversion is a loosely used term. Unless the deposit in the bank without the legally required surety is itself an act of dominion inconsistent with the ownership of the county, we do not believe it to be a conversion in the technical sense. The argument of the depositary sureties does not depend, however, on whether the act of illegally depositing in a bank was conversion.

The argument is that regardless of whether such act may be so designated, it was, in fact, a breach of the treasurer's duty and a failure to faithfully perform his duty, and that from this breach a cause of action immediately arose. Here, say the respondents, is a breach of duty on which the county could have at once sued and recovered judgment for the entire fund deposited. The infirmity in this argument is that unless it was a conversion, the county could not have recovered judgment for the entire amount. It might have recovered nominal damages in vindication of its right. The

money in the bank belonged to the county. Any creditor and debtor relationship between the treasurer and the bank was for the benefit of the county. Indeed, the depositary sureties so argue in their brief under the division devoted to subrogation, as will be hereafter noted. The damages for an illegal deposit, unless it were a conversion, would be nominal, where the moneys were available to the county from the bank. It is analagous of a breach of covenant against liens contained in a deed, broken when the deed is delivered, but giving rise only to nominal damages until the covenantee is forced to pay the lien debt or is ousted by reason thereof. Here the breach would occur when the money was illegally deposited, but as long as the county's money was available to it, no actual damages from the breach would accrue. But the surety intended, and the language of the bond is adequate to exempt it from liability from the actual damages which accrue from the county's failure to get its money on account of the treasurer's breach because of a failure of the bank to pay. No need of becoming ensnared in the thicket of proximate or remote cause. A discussion of the question of whether the deposit in the bank without required security or the failure of the bank caused the loss is beside the point. The surety intended and as far as the language of the bond is concerned, did exempt itself by contract (if the law permits it to do so) from the effects of the bank not paying. If a covenantor against liens attaches to that covenant a provision exempting himself from obligation to pay a tax which was a lien on property, it would profieth little to discuss the question as to whether the exemption was an exception carved out of a total obligation or simply a provision that he would not be required to pay certain damages which might accrue because of the covenantee's payment of the taxes. Nor would it be profitable to discuss the question of whether the failure to clear the property of taxes before delivery of the deed or the county's selling the property because of taxes caused the covenantee the loss. The outstanding point would be that the coven-

antor by contract exempted himself from the obligation to reimburse the covenantee for taxes paid by the latter, just as in this case the official surety placed in its bond the language which by its terms at least exempts it from the requirement of paying money lost because of the failure of the bank. Proximate or remote cause in this case is beside the point. It is a matter of contract. The language of the bond adequately expresses the intention of the surety to exempt itself from the payment of the loss, whether considered as language which exempts it as a surety in certain cases or from the obligation to pay damages arising from a certain type of breach of duty, to wit, failure to account caused by a certain event, viz., of a bank to pay. The contract of the official surety was that it should not pay the county if the treasurer could not account for public moneys because he could not obtain the public moneys from the bank because of the failure of the bank to pay. Intention is adequately expressed by the language. We now revert to the most important and difficult question of this case as above stated as to whether the appellant could, in law, exempt itself from liability in case of loss resulting from the treasurer failing to safely keep or account for public funds, where the failure is due to a failure of the depositary bank to pay to the treasurer public moneys deposited therein. It is around this point that much of the argument contained in almost 500 pages of well-arranged and comprehensive brief rages. In condensing the arguments, we shall proceed in a different order than the same were presented by the brief. The appellant was compelled, because it was the appellant, to carry the burden of showing why it could exclude liability for losses which occurred because of the event of the bank's failure. Since we have come to the conclusion that the official bond by its terms, does in meaning and intention, exclude liability in such case, we shall set out first the respondents' arguments. The respondents (plaintiff and depositary sureties) argue (a) that when the entire structure of the laws setting forth the duties of the county treasurer with

respect to receipts and disbursements, accounting and safe-keeping of public moneys is considered, it is clear that the Legislature evidenced an intention to read into the term "official bond" as used in section 1466, C. L. 1917, and other sections of the Code dealing with liability of official bondsmen, the requirement that such bond should cover all delinquencies of official duty without exception (b) that section 1492, C. L. 1917, reading "The county treasurer must safely keep all money belonging to this state, or to any city or county of this state, until disbursed according to law. He shall not lend the same, and he *shall be liable therefor on his official bond"* by implication makes it a legal requirement that the surety on the official bond cover losses due to a failure to "safely keep" public funds. The full import of these contentions will be better revealed when we state the argument of appellant countering these contentions; respondents further argue that this court, in the case of *Salt Lake County* v. *American Surety Co.,* 63 Utah 98, 222 P. 600, 602, has already decided that the statutes of this state make the county treasurer liable on his official bond without any qualification whatsoever, and that this law is part of a contract of surety between the appellant and the plaintiff.

The appellant denies (a) that the question is stare decisis in this jurisdiction and maintains (b) that a surety on an official bond may, under the laws of this state, by appropriate language in the bond, not only limit its liability to exclude obligation to pay losses caused by failure of depositaries to pay public moneys deposited therein, but that (c) section 4310, C. L. of Utah 1917, which reads in part as follows: "* * * no bond shall be void for failure to comply with the law as to matters of form or substance, but it shall be valid as to all matters contained therein, if it complies substantially with the law," actually, by law, limits the liability of the surety to the matters contained therein, thereby showing an intent on the part of the Legislature not to require bonds to be construed in any event to give full coverage for faithful performance of all duties of the treasurer.

The refinements of appellant's arguments proceed as follows: The statutes prior to 1896 provide specifically that the county treasurer should give bond conditioned for the faithful performance of his duties of which the safekeeping of public moneys was one; that in 1898 the Legislature enacted what is section 1466, C. L. of 1917 in which the county commissioners were to prescribe the amount of the county treasurer's bond and to approve it, thus leaving with the county commissioners, it is argued, the duty to fix conditions and the amount of the bond; that in the case of the state auditor and state treasurer a change in the statutes was also made in 1896 omitting the requirement as to specific conditions to be contained in the bond and providing only that they should execute official bonds of designated amounts; that the statutes in the case of all city, county, and state officials before 1896 set out a condition which was to be contained in the bond, but after said year a distinction was made between some state officials and others in that the statute in some cases set out the condition of the official bonds and in others did not do so, whilst in the case of county officials after 1896 no specific condition was required, by statute, to be inserted. From this, argues appellant, where a condition is not prescribed by statute, and the bond is tendered, the obligation of the bond is measured by its terms. The Legislature intended in some cases to require a condition to be inserted and in other cases to depend upon a common-law bond. The next proposition advanced is that even in case a bond does not contain the condition required by the statute (if it be required) and there is no so-called remedial statute which provides that a bond which does not contain a required statutory condition shall nevertheless be construed as if it did contain such condition, the obligation of the bond is measured by its terms; that in Utah, not only is there no such remedial statute, but the statute, section 4310, the material part of which, for this question under consideration, was quoted above, in terms provides that it shall be valid as to the matters contained therein; that this by inference

means that as to matters not contained therein the bond does not speak, and a fortiori a bond which contains expressly an exemption speaks validly as to that matter. The appellant denies that the legal effect of section 1492 is to provide that the official bond shall contain a provision conditioned for the safekeeping of money or that it is in effect a remedial statute providing by implication that the bond, regardless of its language, shall be construed as insuring said duty. Appellant sets out a list of the states having remedial statutes and quotes from the statutes of those states, to show the type of statute which expressly provides that an official bond shall, regardless of its language, stand for an obligation to pay any loss arising from a breach of official duty. Also are listed, with cases therefrom, those states not possessing such statutes wherein it is held that the coverage of the bond would be according to its terms. In only two states, Louisiana and Illinois, claims appellant, is it held that, without a remedial statute, coverage of the bond would be extended to be coextensive with the duties of the official, when the language of the bond does not make it so. Appellant cites the cases of *Murdo Township* v. *Townsend*, 56 S. D. 576, 229 N. W. 935 (1930) and *Thunder Hawk School District* v. *Western Surety Company*, 58 S. D. 312, 235 N. W. 921 (1931) as definitely holding that a statute practically identical with section 4310, C. L. 1917, is a remedial statute which allows recovery against the surety only according to the terms of the bond. These cases will be later considered.

We shall first examine the contention of the respondents that this court, in the case of *Salt Lake County* v. *American Surety Company*, Supra, has already answered the question here propounded. If so, it ends this part of the case. In that case, the question under examination was as to whether under section 4500, C. L. 1917 (before the amendment of 1929) the treasurer, and, therefore, his surety was strictly accountable for public funds placed in the bank, regardless of whether he had been prudent or im-

prudent, negligent or guilty of fraud in depositing the funds. It was held that the treasurer was strictly liable without qualification, and consequently, the surety whose coverage was, by the language of that bond, coextensive with the liability of the principal, was likewise strictly liable. The bond in that case had no excluding provisions. The question in that case was not whether a surety could limit its liability, but whether under a contract to stand back of any liability the treasurer might have, he, and therefore it, had a liability where there was no negligence. The opinion did state "The statutes of this state make the county treasurer liable on his official bond without any qualification whatever," citing section 1492, C. L. 1917. The quoted matter must be read in the light of the question there under examination. Perhaps the writer of that opinion believed that a surety could not limit its liability, but the quotation from the opinion can only be interpreted as reflecting on the question he was considering. It must, therefore, be read as meaning that under the bond as it was there written the surety was liable because the treasurer was at all events liable. The question there was: "Is the surety under this bond *as we have it here in this case* liable for County moneys, even though its principal was free from negligence?" The quoted matter from that opinion set out above meant to say "Section 1492 requires the County Treasurer to safely keep all moneys belonging to the County. This is an absolute duty. He is an insurer of the money; consequently his bondsman in this case, having contracted for full coverage, is unqualifiedly liable." The expressions of the writer of that opinion can only be as broad as the question to which they relate. The question of whether the surety could limit its liability was not before the court. Consequently, the language could not apply to such question and must function only as a part of the reasoning in the arrival to a conclusion in regard to that question. Otherwise, such language would not even be dicta, but would be entirely irrelevant to the question under review. Obiter

dicta is that part of an opinion which does not express any final conclusion on any legal question presented by the case for determination or any conclusion on any principle of law which it is necessary to determine as basis for a final conclusion on one or more questions to be decided by the court. It may, however, be relevant in that it is explanatory of the rationale. Unless the expression contained in the American Surety Company decision reflects upon the question there presented, which is not the question here presented, it would be irrelevant and not even dicta in the ordinary sense. We must, therefore, conclude that the American Surety Company Case is not stare decisis in this jurisdiction on the question of whether an official bondsman may limit its liability to less than that of its principal. This clears the way for a conclusion on that question itself. Appellant and respondents seem to agree that before an official surety can be held to the full coverage of its principal where it, by appropriate language, limits liability to less than that of its principal, there must be a legislative expression to the effect that it cannot limit its liability to less than that to which the official may be subject. The parties really divide on the question as to whether the laws of Utah show an intention of the Legislature to so provide. It will be unnecessary, therefore, for us to discuss the numerous cases cited by the appellant to show the types of remedial statutes which have been passed in the different states or to consider the question of whether, without any remedial statute, a surety could not limit its coverage to less than the full liability of the treasurer. Respondents contend that section 1492 in effect combines a requirement that the treasurer's bond contain a provision covering the safekeeping of and accounting for public moneys together with an implied provision that if such is not in the bond, the law shall read it in. Respondents say this section has just that legal effect. Appellant counters by denying that the section has such legal effect, and furthermore asserts that section 4310 actually expresses the legislative intention that an official bond shall be valid

*only* as to matters contained therein. Since there is a dispute as to the construction of section 1492, we shall set it out in full. It reads:

"The county treasurer must safely keep all money belonging to this state, or to any city or county of this state, until disbursed according to law. He shall not lend the same, *and he shall be liable therefor on his official bond.*"

All parties agree that the Legislature has the constitutional power to attach specified obligations to an official bond, regardless of its language. The appellants contend that this section makes the surety liable only in case the treasurer lends the money. The section could be more clearly worded, but we think that it is fairly evident that the Legislature intended it to mean that the treasurer should be liable on his official bond for the safekeeping of public money. The word "same" refers back to money. The word "therefor" refers to "same," and consequently, to the word "money." The statute must be construed to read that the treasurer must safely keep moneys belonging to the county and not lend the same, and that he shall be liable therefor on his official bond. The prohibition not to lend the same may perhaps be implied in the admonition "safely keep," yet the Legislature desired to make that more specific. As stated by the plaintiff, to construe this section as a legislative expression of a surety's liability only in case of a lending comes close to imputing to the Legislature an intention to relieve the surety in all cases except where the money is loaned. The duty to "safely keep" the public moneys is laid down in section 1475, C. L. 1917. There would be little point in reiterating that duty in 1492 unless it was for the purpose of expressly making a treasurer and his surety liable on the official bond. The fact that the prefix to section 1492 reading "treasurer not to lend public money" was composed and attached by a Code Commission authorized expressly by chapter 22, Session Laws 1897, to prefix each section with apt words indicating the subject-matter is

really of minor weight in indicating what the Legislature intended by the section. It is more trustworthy to gather the intention of the Legislature from the language of the section and from other sections throwing light upon it, coupled with the reasonable inferences which the object sought to be accomplished gives rise to than to guess at the particular reason why the particular person who composed the prefix may have thought such prefix apt. One might indulge in like speculations in regard to newspaper headlines. Certainly the prefix adverts to one portion of the subject-matter of this section, but a prefix reading "Treasurer to be liable on his official bond" would have touched another portion just as aptly. The headline writer had to be terse. Why he took one of the subject-matters rather than the other as a key sentence throws us in the realm of pure speculation. We believe the plaintiff is nearer to a correct interpretation when he states that section 1475 prescribed the duty of the treasurer while section 1492 definitely by law laid upon the surety a liability.

Reading section 1492 as above indicated, it remains to determine its legal effect. In effect, it says: "The Treasurer shall be liable on his official bond for the safe keeping of public moneys." This is the same as saying "The Treasurer and his surety shall be liable on the Treasurer's official bond for the safe keeping of public moneys." ■ There would be no point in requiring merely the treasurer to be liable on his bond. He is liable independently of his bond. His bond is not only his contractual relation, but his surety's contractual relation. To bind the surety is the prime purpose of the bond. What the law says in effect is: "Mr. Treasurer, you must safely keep public moneys; you must bind yourself on your bond to be liable for them, which means, of course, that your surety must bind itself for a co-extensive liability." The law did not mean to say the treasurer, as principal should be liable, but that the surety need not wholly bind itself; nor did it mean to say that the treasurer and his surety shall be liable unless the

surety exempt itself. The positive mandate of the law is that both the surety and the treasurer shall be liable. That means that the bond must by its terms make them liable, or if not, it will be read as if it did. This provision of law, by implication, requires the bond to be read as if it was conditioned for the safekeeping of public money. Thus, by implication, the law requires the bond to be conditioned for such safekeeping or, if not so conditioned, it will be treated as if it did so provide. The remedial provision is implied.

Looked at another way, the law, by saying the treasurer shall be liable on his official bond for the safekeeping of public money, in effect requires him to contract to perform that duty and to be liable on his contract, if he did not perform it. He would be liable in all events, but the law went further and said he must contract to be liable. True, he only binds himself on the bond up to the amount designated by the county commissioners to pay a loss due to a failure to faithfully perform his duty, but the law, in effect, said, when you are required to bind yourself to pay a loss resulting from an unfaithful performance of the duty, you by necessary implication agree to perform that duty. Thus the treasurer is required by law to contract (by his official bond) to perform a duty which, in addition, is imposed on him by law, independently of the bond, and to pay losses due to such failure to perform up to $50,000. While the surety may, when not restricted by law, contract to limit its liability so as not to make its liability coextensive with the statutory liability of the treasurer, yet when the law requires the treasurer to contract to perform the duty and to be liable up to a certain amount because of the bond, and to procure a surety therefor (which is the meaning of a bond), it is inconceivable that the law would not require that the surety also be equally as liable as the treasurer under that bond. It is inconceivable that the law meant to say: The treasurer as principal on his official bond shall be liable as he has been required to contract to be liable, but the surety on that same bond shall only be liable to the extent that it actually by the

terms of the bond makes itself liable. Such a bond would be a useless one, because the principal, as treasurer, by the statute would be liable independently of the bond. There would be no purpose in making him contract for the liability except to draw into that liability his official surety. The provision in section 1492 that the treasurer shall be liable on his official bond cannot mean that he shall be liable, but his surety only as the surety may contract. A mandate making the treasurer liable on his official bond implies that his surety shall also be liable by law thereon.

But appellant strenuously contends that even though we construe section 1492 as above stated, section 4310 specifically provides that the surety shall be liable only according to the terms of its contract. We think appellant misconceives the office of this section of the statute. The section reads:

"The bonds of all civil officers shall be construed to cover duties required by law passed subsequent to giving them, and no bond shall be void for failure to comply with the law as to matters of form or substance, but it shall be valid as to all matters contained therein, if it complies substantially with the law."

The section literally read in unintelligible. Down to the first comma, it is quite understandable. Had the section omitted the phrase at the end reading, "If it complies substantially with the law," it would be intelligible. This phrase appears to negative what goes before it. The section says:

"No bond shall be void for failure to comply with the law as to matters of *form or substance*, but it shall be valid as to all matters contained therein, *if it complies substantially with the law.*"

In other words, it shall be valid as to all matters contained therein even if it fails to comply with the substance of the law, provided it complies substantially with the law. Literally, the section makes nonsense. Either the last phrase must be omitted, or it must be given a meaning different from the

phrase which precedes it, which speaks of complying with the law as to matters of substance. The partial section may be read as follows: "Provided a bond complies substantially with the law it shall not be void because it fails to comply with the law as to matters of form [or substance] but shall be valid as to all matters contained therein." The words in brackets may be omitted, in which case it may be intelligible. But this construction fails to give meaning to one important word in the section. If possible, we must construe a section to give meaning to every part of it. The section may be reconstructed, as above set out, leaving in the words "or substance" and be construed to give the phrase "if it complies substantially with the law" a very broad meaning. This phrase may be construed to mean "if it is intended to be the sort of bond provided by the law." It would thus be construed to mean "if a bond is the sort of bond intended by the law, that is if it was meant to be an official bond or the type of bond which the law requires the civil officer to obtain, it shall not be held void as such because it does not conform to the law in matters of form, or if it omits or fails to comply with the law in matters of substance, but shall be held valid rather than void as to matters therein contained." We leave the reader to choose which of these constructions most nearly comports with the intention of the Legislature. It is unnecessary for us to make the choice, for whatever way it may be construed, it does not go as far as appellant contends for. It was passed to prevent the courts from following that rule which held that a bond which did not conform to the law was void and thus permit a surety to escape liability even for that which by terms of the bond it contracted to be liable for. The difficulty of the appellant is that it reads the word "only" in the section after the word "valid." The section was never intended to deal with a case where the question arose as to whether the law required something to be read into a bond. This section does not touch that field of inquiry. This section says a bond not conforming to the statute will be at least valid as far as it

goes, but it is entirely non-committal and neutral on the question whether in certain cases the law requires something to be read into a bond if it is not contained therein. This section 4310 meant to save the bond for at least that much of the contract which in its own terms it recited rather than permit the surety to void it totally. What the bond might have to stand for beyond its terms by reason of some other statute, remedial or whatever it might be called, was a matter which section 4310 did not deal with.

We must conclude, therefore, on this division of the case, that between the appellant and the plaintiff, the appellant is liable to the county on the bond to the extent of moneys not accounted for by the treasurer or up to $50,000. Indeed, this conclusion seems to be supported by the thought that it is unlikely that the Legislature would leave to the county commissioners the decision as to whether the bond should fully cover the duty of the treasurer, to account for public money unqualifiedly, or whether it should exempt the surety where he failed to regain it because a bank had not given the depositary security required by amended section 4500. There is point to the idea that the Legislature, by implication, as gleaned from the various statutes dealing with the duties of the county treasurer, intended that the official bond, as that term is used in the statute, was to cover all the duties of the treasurer without qualification. This is borne out by the fact that section 4310, C. L. 1917, makes the official bond cover duties imposed by statutes subsequent to the making of the bond. The implication is that if it makes a bond cover duties which neither the treasurer nor the surety had in mind at the time the bond was made because they did not exist, that, a fortiori, it must have intended, that all duties existing at the time the bond was made should be covered by the bond. It was rather odd for the Legislature to require that the bond should cover after imposed duties, but that it would leave the way open for the bond to exclude duties already existing

at the time it was made. Appellant's assignments of errors 1, 2, 3, 4, 5, 12, and 13 are therefore overruled.

The next matter relates to the lower court's judgment finding that the appellant was not entitled to recover from Farnsworth, its principal, any of the sums which it paid to the county on his account. Ordinarily one might believe that the right of the surety to recover from its principal that which the principal should have paid would be unquestioned, but in this case Farnsworth contends that the surety's requirement that he keep in his immediate possession money to meet the ordinary demands upon his office, and that the remainder be deposited in depositaries designated by the surety in the manner specified by it, exacted a surrender of Farnsworth's discretion as county treasurer, which was against public policy. Being a contract to do something against public policy, says respondent Farnsworth, the law will not grant the surety relief, but will leave it where the law finds it. It is somewhat interesting to note that Farnsworth makes the claim that the surety illegally reserved a power to interfere with his discretion, whereas the respondents' individual sureties on the depositary bond contend, as we shall see later, that appellant's right of subrogation is defeated by the fact that it neglected to require Farnsworth to withdraw from the bank which had not given the security required by amended section 4500. One party says the surety reserved too much control, the other says it did not exercise enough. It was rather unfortunate that Farnsworth did not discover sooner that he had contracted to permit the surety to interfere with his discretion, or, better still, it was unfortunate perhaps that his discretion was not actually interfered with. If it had been and the money put in a safer bank, there might have been no need for this opinion. The fact is that Farnsworth, in answer to a letter from the surety, demanding that he withdraw all moneys from the Beaver Bank in excess of the amount of corporate surety depositary bond or legal collateral, resisted and ignored the demand. Regardless of whether the con-

tract between Farnsworth and the surety embraced in his application and bond, sought to restrict the statutorily given freedom in dealing with county funds, as an actual fact he enjoyed freedom even beyond the bounds of legality in that regard. So by no stretch of imagination can it be said that the exceptions contained in the contract between the surety and principal in any way caused Farnsworth's loss. The contrary is perhaps true. His failure to take the advice of the surety or abide by the contract which he made may have caused it. This leads us to say that we find in this case no surrender of control by the treasurer or no contract to surrender that control. It has been held that "if a trustee enters into any arrangement with reference to trust funds which surrenders or limits his control over them, he becomes the guarantor of the fund, irrespective of his motives, or whether his surrender of control was the cause of the loss of the fund." *McCollister* v. *Bishop,* 78 Minn. 228, 80 N. W. 1118. This is not the case of a trustee giving a surety company or some stranger the veto power on withdrawals from the bank, as was the case of *Fidelity & Deposit Co.* v. *Butler,* 130 Ga. 225, 60 S. E. 851, 16 L. R. A. (N. S.) 994, set forth in the brief of the depositary sureties. In that case were considered a number of English and American cases where it was held that a trustee, whether public officer, receiver, guardian, or other fiduciary, who contracts to surrender his control to another, has made a promise contrary to public policy. A surety entering into such a contract, it was held, could not recover. We are not called upon to decide in this case whether a surety which contracts for joint control with a trustee can recover against the trustee after it is required to pay the beneficiary or creditor, because that situation is not before us. Where a surety merely contracts to be advised or consulted as to where money is to be deposited, it is not illegal or against public policy. It was stated in the case of *McCollister* v. *Bishop,* supra:

"It is customary, as well as entirely proper, for these fidelity companies, before executing bonds as surety, to insist on being advised,

and having some understanding with their proposed principal, as to where the trust funds will be deposited. This is a matter which affects the risk which they will assume if they execute a bond. It also enables them to keep track of the conduct of their principal with regard to the disposition of the fund. The facts pleaded in this case do not show any surrender in whole or in part of the principal's absolute control over the trust fund. He had the right to deposit the money in his own name as assignee. He had the right to draw it out as he saw fit. His surety had no control of, or veto power over, these matters. He had the absolute legal power to change the depositary whenever he saw fit."

This is not the case of where the surety requires something to be done which is illegal or where the surety insures the results of an illegal act or an act based upon an illegal consideration, or insures losses resulting from such act. This is not the case where the surety requires funds to be diverted from the public treasurer in such a way as to be illegal or against public policy or even where the surety agrees to insure the loss resulting from such diversion. The individual depositary sureties may be in that position and might even defend on that ground as against a suit by Farnsworth, if it were not for the fact that such defense is not permissible in a case where public or trustee moneys are involved and where the county or the treasurer for the benefit of the county may reach such depositary sureties. Indeed, no such defense could be interposed where the surety was a bondsman for a trustee and the beneficiary under the trust had no part in the illegal transaction. We have here a case in which the law permits moneys to be deposited in a bank under certain conditions. The right that the surety is presumed to have reserved is a right to compel the treasurer to select the sort of a bank as depositary which in the exercise of his sound discretion he should use. It might, indeed, be impossible to obtain a reputable surety on any official bond if it were not given some right to say where the funds should be kept, the safe-keeping of which it guaranteed. And certainly it should have at least the right to contract to require a deposit in

some bank which would furnish legal depositary security. There is no reason to conjecture that it would exercise its powers beyond requiring that the treasurer select such depositary. If a surety could not thus protect itself, it might be in a precarious position. In the case of a noncancellable bond, it would be compelled to sit by and watch the deposit of public moneys in unsafe banks with nothing but a hope to lean upon that the bank might outlast the life of the bond or be compelled to resort to a suit in equity with delayed results. Assignments 6 and 16 are well taken. The court was in error in holding that the indemnity agreement, constituted by Farnsworth's giving of the bond, in pursuance of the application signed by him in which he promised, in case the bond was issued, to indemnify the surety against all loss, costs, charges, etc., which the surety might sustain or incur by reason of its becoming his surety was not valid and enforceable. Judgment should have been in favor of the appellant against Farnsworth for such sums as appellant was required to pay the county, together with expenses which reasonably arose because of, or in consequence of appellant becoming surety for Farnsworth, but not such expenses as the surety incurred because of its refusal to pay the county. Appellant's assignments of error 6, 7, and 16 are therefore sustained.

This brings us to the consideration of the interesting question of subrogation, which transfers the controversy to one between the appellant and the individual sureties on the depositary bond herein called depositary sureties or respondent sureties. These sureties, respondents here, are just as avid in their contention that the appellant cannot be subrogated to Farnsworth's right against them as they were in contending that appellants were liable to the county on the official bond. They make no concealment of the fact that their interest in such outcome lies in the fact that it would avoid the necessity of their making good on their depositary bond or at least result in some apportionment between them and the appellant of the

$25,000 which is the extent of their combined liability under the depositary bond. It should be first noted that Beaver county is named as the beneficiary under the official bond, that the "Treasurer of Beaver County" is so named as the obligee in a depositary bond. The respondent sureties admit that in the absence of misconduct or illegality on the part of the corporate surety it would, after payment to the county, be entitled to succeed to such rights of the county under any bond or other security held by the county, under the general theory of subrogation; that after a creditor has been paid in full "The surety will be entitled to every remedy which the creditor has against the principal debtor." But, say the respondent sureties, in this case, two factors defeat the right: First, that in this case the county and not Farnsworth personally is the obligee on the depositary bond; and, secondly, appellant knew and acquiesced in the unlawful conduct in depositing public moneys in the bank, and that it had a duty to require its principal to do his duty; that it stood by knowingly permitting him to continue in an illegal transaction constituting a breach of duty and cannot, therefore, be substituted in the place of the creditor. Sixty-nine pages of the brief of the depositary sureties are devoted to developing these propositions and in explanation and elaboration of the reasoning employed to support them and in citing the cases purporting to be in point, or at least illustrative of the principles upon which the defeat of the claimed right by the appellant depends. The best attack on the question proposed for examination lies in understanding the more ultimate principles upon which subrogation, or its synonymous term "substitution" depends. It began as a rather narrow doctrine borrowed from Roman or civil law and was confined to the case where one secondarily liable was compelled to pay the debt of one primarily liable; thus an indorser on a note was permitted to be subrogated to the payee against the maker where he paid the payee-creditor. The surety or guarantor was permitted to indemnify itself from its principal by succeeding to the

rights of the creditor against such principal. It should not be overlooked that in many cases where subrogation is allowed, there exists a direct right against the principal debtor, either by express or implied contract. Thus, in cases of suretyship and guaranty, there is, if not an express contract, as in the instant case, an implied contract that the principal should indemnify the surety if the latter is compelled to pay the creditor. In such cases, as far as the surety was concerned, he could have reached the debtor for whom he stood surety directly on such contract. But by being subrogated to the rights of the creditor, he was able to reach beyond the rights which arose by his contract, or was enabled to take advantage of equities which lay in the creditor, but which were not inherent in the contract. He could, for instance, reach securities taken by the creditor or take advantage of liens which the debtor had created for the benefit of the creditor. Therein, and in cases where the surety was compelled to reach a party with whom there was no express or implied contract who in good conscience ought to pay, lay the chief value of subrogation. Equity rapidly extended the use of this very salutary principle until it became apparent that the only ultimate rule which could be said to govern the principle is that equity would apply it wherever it was necessary to do equity or justice or prevent an injustice. The principle was also applied wherever properly pleaded facts existed, which made the principle applicable. Where one paid the debt of another under duty or compulsion or a promise so as to take that payment out of the class of voluntary payments, as the term voluntary was used in the law, then equity, recognizing such debtor should not unjustly enrich himself by the retention of property which he should apply to the debt, permitted the payor of the debt to be substituted to the creditor. Thus, the debtor was pursued and the one which should ultimately respond was made to respond. The situation until that happened was still in unstable equilibrium. Naturally, no restricting rules should hamper this result. The text-writers

and students of the subject endeavor, by an examination of various cases, where the doctrine had been applied, or application denied, to scientificize the subject by classifying the cases and deriving therefrom a set of rules; but in the last analysis, the ultimate principle is the only one from which it is safe to reason, to wit, that equity employs subrogation when that doctrine is necessary to work out a just solution of the problem. Subrogation will be extended as far as it is necessary to accomplish this. Whenever, in respect to the involuntary payment of a debt, it is just and equitable that some one else more fundamentally liable or when it would work an inequity if ultimate payment did not fall on him, there subrogation will be permitted. Where the equities are equal between the payor of the debt and another from whom he seeks recourse it will be denied. These principles are abundantly illustrated from the cases chosen by the respondent sureties themselves. In *New York Title & Mortgage Co.* v. *First National Bank,* 51 F. (2d) 485, 487, 17 A. L. R. 1052 (8 C. C. A.), a loan broker through forgeries and misrepresentations procured title insurance policies, guaranteeing the loan association against loss by reason of defects in mortgagor's title to realty described in mortgages or deeds of trust securing the loans. The borrowers in each case were fictitious persons. The loan broker, upon receiving possession of checks from the loan association, forged the names of the supposed payees and deposited them in his own bank account and converted the proceeds. The checks were ultimately paid by the depositor bank and charged to the loan company's account. Subsequently, the title insurer paid the resulting loss to the loan association and brought suit against the depositor bank to recover the amount it was compelled to pay. The court said:

"We think it clear that plaintiff is not entitled to invoke the remedy of subrogation, because that right is an equitable one, and is applicable in cases in which one party is required to pay a debt for which another is *primarily* answerable, and which, in equity and good conscience, ought to be discharged by the latter. It is the method which

equity employs to require the payment of the debt by him who in good conscience ought to pay it, and to relieve him whom none but the creditor could ask to pay. It cannot, as a matter of right, be invoked in all cases without regard to circumstances, but only in cases in which justice demands its application, and the rights of one asking subrogation must have a greater equity than those who oppose him. As said by this court in *American Surety Co.* v. *Citizens' National Bank* [ C. C. A.] 294 F. 609, 616: 'The right of subrogation is an equitable right, and where equities are equal the right does not exist and there can be no relief.' "

It is apparent that the bank, being imposed upon by a defrauder into innocently paying money on account of the loan company, should not be the one on whom ultimately should fall the obligation to pay the loan any more than the surety who contracted to pay said company in case of a defective title. The fact that the loan company had two independent sources of recoupment, one from the bank where it was a depositor and the other from the surety company which had contracted to pay would give neither the surety company nor the bank a right of subrogation as respects each other. There was no superior equity in favor of the surety company. There was no reason in equity why the surety company should collect the amount of the obligation from the bank which had been induced to pay by misrepresentation. There was nothing in the bank's contract with its depositary, the loan company, which was that it would pay out money on account of the loan company only upon a true order and genuine indorsement, which gave the surety the right to make the bank ultimately pay, or which made it inequitable for the bank to save itself whole. The bank was not unjustly enriching itself by failing to pay a legitimate obligation; it simply was where it would have been had the cheat not taken place.

In the case of *Western Surety Company* v. *Walter*, 44 S. D. 112, 182 N. W. 635, 636, 24 A. L. R. 1519, the relatives of a deceased treasurer whose accounts were found short gave a note to the county to secure it for the loss suffered.

The surety on the official bond gave the county the balance remaining unpaid on the note after the widow of the deceased treasurer had paid a part thereof. The surety took an assignment of the note from the bank and sued the makers thereof for the amount still unpaid on the theory that it had the right to be subrogated to the county, the original debt for which the note had been given as security having been wiped out by payment by the surety, which prevented suit as an assignee of the security. The court held that it did not have the right to be subrogated. It said:

"Subrogation is—'the mode which equity adopts to compel the ultimate discharge of the debt by him who, in good conscience, ought to pay it, and to relieve him whom none but the creditor could ask to pay * * * and the rights of one seeking subrogation must have a greater equity than (the rights of) those who oppose him.' 37 Cyc. 870, 871."

The note given as security was given not "for the benefit of the surety, but to indemnify the county against any loss from a defalcation *already accrued;* and for which the county had a right of recovery against the defaulter's estate and against the surety." (Italics ours.) Had the note been given as security by *the treasurer* to the county to secure payment of any losses which might have accrued, the surety could have pursued it as any paying surety may pursue securities which its principal has given to the creditor. Since the note was given by a third party and not the treasurer to secure the county, subrogation could not be available to the surety because there would be no reason in equity why such other securer of a treasurer's obligation should be required to pay another person who has not jointly but independently secured the obligation. As well might the relatives who had given the county the note to secure the claim against the dead treasurer's estate have tried to come against the surety for recoupment, had they been required to pay their note. The equities in that case were at least equal. Where one of two joint sureties is indemnified by securities not coming from the principal, but

from a stranger, the other surety cannot participate in the indemnity. See *Leggett* v. *McClelland*, 39 Ohio St. 624. But where one surety obtains indemnity from the principal, a co-surety may recover his portion because, "the taking of such indemnity from the principal lessens his [the latter's] ability to pay, it would be a fraud on his co-sureties to allow him to convert it to his sole use in the absence of their consent. As trustee for his co-sureties, he is bound to such discreet and reasonable use of the securities as would be required from a trustee." Indemnity coming from the principal to one surety is indemnity to all sureties, because the principal's obligation to the sureties is equal. *Carpenter* v. *Kelly*, 9 Ohio, 106. It would be inequitable to permit one co-surety to indemnify himself from securities *obtained from the principal* to the exclusion of his co-surety because coming from the principal it lessened the co-sureties' ability to obtain a like recoupment from the principal as had been obtained by the other surety from the indemnity; but where one surety was indemnified by a stranger there is no equitable ground for permitting a co-surety to participate in such indemnity. His position has not been detrimentally changed over what it would have been had the co-surety not received the indemnity from the stranger. The good fortune of the co-surety is not his misfortune, nor has he in any way suffered a detriment because of it. Throughout, the matter of doing equity under the whole situation controls. Withdrawing our attention for a moment from the analyses of these cases cited by the depositary sureties, it should be noted that in the instant case, the sureties on the depositary bond were not co-sureties of the treasurer nor were they independent sureties of the same debtor. They were sureties of the bank, whereas appellant was the surety of the treasurer.

In the case of *Marshall & I. Bank* v. *Mooney et al.*, 205 Mich. 513, 171 N. W. 533, 534, an indorser gave the payee his note and mortgage to secure his endorsement on the primary note held by the payee. The court said:

"It is insisted in the brief that defendant's coindorsers have equities in the note and mortgage, and that this is an attempt to enforce it for their benefit. It is quite possible they may have a right to demand of defendant Mooney that he contribute his share of the amount paid on the principal indebtedness, but the doctrine of contribution would give them no legal title to nor lien on the note and mortgage. It must not be overlooked that this collateral was furnished to the payee *by a surety*, and not by the maker. Had the note and mortgage in question been given by the maker of the note, upon payment thereof by the sureties, they would have a right to demand the collaterals, *but that rule does not apply where a third party furnishes security in aid of an indorsement.*" (Italics supplied).

In the case of *Plate Glass Underwriters' Mut. Ins. Co.* v. *Ridgewood Realty Co.*, 219 Mo. App. 186, 269 S. W. 659, 660, plaintiff insured the tenant against loss or damage because of breakage of plate glass. The plate glass was broken and the plaintiff paid the damages under its insurance contract. It then sued the landlord because the tenant's lease provided that all repairs with certain specified exceptions should be made by the landlord. Plaintiff's policy with the tenant provided that it should be subrogated to "all the rights of the assured against any person or corporation as respects such loss," etc. The court said:

"But we do not think any rights of subrogation exist in this case. Subrogation is a child of equity, which in later years has grown into and become a principle of law; but its origin or basis is in the nature of things, i. e., it grows out of natural justice demanded by the facts of the situation. For instance, if one secondarily liable for a debt pays it, he is entitled as against the debtor who is primarily liable to be subrogated to the creditor's rights, and such right of subrogation arises, by operation of law, out of that situation with or without an agreement to that effect."

Here is another case where the tenant or creditor had two sources of recoupment as in the *New York Title & Mortgage Co.* Case, supra, but because he chose one and not the other, gave the one he chose to pursue for that reason no right to reimburse itself from the other. There is no equity in favor of an insurance company who pays the claim to come against another, because that other

has also a contract to pay. The equities are equal as in the case of two independent sureties of the same principal. In the *Ridgewood* Case, the landlord who did not have to pay a damage because the insurance company paid the loss is not unjustly enriching himself. Had he owed the tenant a debt and had the surety paid it, equity would have been that the final payor of that obligation was the primary debtor. But a contingency made both independently liable to a third party because such third party sought to pursue one did not give that one a right against the third party's independent contractor.

In *Minshull* v. *American Surety Co. et al.*, 141 Wash. 440, 252 P. 147, 149, the court said:

"Subrogation is an equitable theory, and adopt it or reject it in accordance with the equities of the situation."

In the *Minshull* Case, the depositary surety, *having paid the full amount of the bond* was allowed to participate pro rata with the official surety in dividends from the bank. The court held that they were both essentially sureties of the county and therefore to be treated alike in the matter of recoupment from the bank. The matter of whether the depositary sureties, having paid to the full extent of the bond, should participate equally with the official sureties in the assets of the bank, both being then general creditors, is a different question from that which inquires whether the official surety who has paid can recoup from the depositary surety which failed to perform its obligation to put money into the hands of the treasurer to pay his obligation to the county.

In the instructive case of *U. S. F. & G.* v. *McClintock* (D. C.) 26 F. (2d) 944, it was again held that where both official and depositary surety performed their full duty of payment, both should share as general creditors through subrogation to the county's claim in the ratio that they had paid the county.

In the case of *National Surety Company* v. *Salt Lake County* (C. C. A.) 5 F. (2d) 34, it was held that the treasurer is a creditor of the bank and that the sureties on the depositary bond have no right to dividends from the insolvent bank until the treasurer is fully paid. This case recognized a difference in levels between the official surety and the depositary sureties and that it was the duty of the depositary sureties to place in the hands of the treasurer moneys with which he could have paid the county which would have relieved the official surety to that extent. In the *National Surety Company, Minshull* and the *U. S. F. & G. Co.* Cases, the depositary sureties had paid to the full extent of their bond and the county had been fully paid. It was a question in the first of these cases whether the depositary surety should be postponed in the payment of dividends until the treasurer had been fully paid which, in consequence, would have further relieved the official surety because it would have been entitled to all the moneys that came into the treasurer's hands from the bank after the county had been fully paid. In the other two cases, it was held that the depositary sureties, after they had paid the full amount of their bonded obligations, should not be postponed in the sharing of dividends until the treasurer, and, consequently, the treasurer's official surety, had been reimbursed up to the full amount of what the bank owed the treasurer. In all of the cases, however, the depositary sureties had fully paid so that it was not a question of whether the official surety could come against them after having paid the county, to collect what the treasurer himself could have collected from them, but the question of how the assets of the bank, as far as the two different types of sureties were concerned, should be distributed between them. Of course, if the depositary sureties paid to the full extent of their bond liability, there can be no subrogation as against them on the part of the official surety. The only question that remains then is whether the official surety, through the treasurer, has a prior right, through subrogation, to the

bank's assets over the right of the depositary's sureties to be subrogated to the treasurer's rights against the bank.

Keeping in mind the principle as we have seen it displayed in the above cases, that equity applies the doctrine of subrogation in order to work out a just result, how should it be applied in this case? We lay aside for the moment the argument that appellant cannot be subrogated because it was not without fault in permitting the treasurer to continue illegally to deposit public moneys and that it is barred by public policy from a right of redress against the individual sureties. These arguments will be later considered. We will first consider the pure question of subrogation as if those latter questions were not in the case. The bank in this case was the direct debtor of the treasurer. The difference in the contention of the appellant and the depositary sureties is as follows: The depositary sureties claimed that since the principal in the depositary bond is not Farnsworth personally, but the "Treasurer of Beaver County," the real obligee under that bond was the county. This is because the funds were public funds, and the treasurer, in depositing them, deposited funds of the county, and the real obligation of the depositary sureties was to pay the county. The official surety contends that Farnsworth is the creditor of the bank, and that he being its principal, it can be subrogated to all rights he has against the bank, since a surety generally can be subrogated to all the rights of its principal. We shall later show that it makes no difference which conception is adopted. The bank in this case was the direct debtor of the treasurer. A relationship existed because he was the depositor. He had the choice of whether to deposit or not. He had the choice of whether he should raise a relationship of debtor and creditor between himself and the bank. He had that choice under amended section 4500. We are inclined to think that had he complied with amended section 4500, he could not, even though exempt, have completely divested himself of the relationship of a creditor to the bank. Certainly a depositary surety

who paid could be subrogated against the bank on the theory
that it could be substituted to the rights of a creditor to the
bank when it paid the bank's indebtedness to that creditor.
Whether this right of subrogation is one which would have
to be postponed until the official surety, through subroga-
tion, was first paid to the extent that it had paid to the coun-
ty, is a question which we do not need at this time to discuss,
because the depositary sureties in this case have not paid the
treasurer. This court is committed to the doctrine that the
treasurer is an insurer to the county for public moneys
which have come in his hands as treasurer. See *Salt Lake
County* v. *American Surety Company,* supra. The only ex-
ception is as provided in amended section 4500. A fortiori
when a treasurer does not comply with section 4500, he can-
not drop out of the picture, as it was held that he could in
the *McClintock* Case, supra, when he had complied with all
the requirements of the law. As stated above, we believe
in this state the treasurer, even though he complies with the
law, is still a creditor of a bank and a debtor to the county.
This is not inconsistent with the conception that the county
is also a creditor of the bank. Anything said by Mr. Justice
Straup in the case of *Pixton* v. *Perry,* 72 Utah 129, 269 P.
144, is not inconsistent with this theory. True, the deposi-
tary bond is primarily to protect the county. The realistic
situation is that in most cases if the bank cannot pay, it is
not ultimately that the treasurer loses unless he is independ-
ently able to respond, but the county; therefore, the bond
is primarily to protect the county and not the treasurer. The
moneys in the bank are public moneys, and they are held by
the treasurer for the benefit of the county. But this is not
the same as saying as between the bank and the treasurer,
the latter is not a creditor. The county is likewise a creditor
of the bank, in the case at bar, for two reasons. The money
placed illegally in the bank became a constructive trust fund
with the County as beneficiary. See *Tooele County Board
of Education* v. *Hadlock,* 79 Utah 478, 11 P. (2d) 320. In
every trust fund relationship there is imbedded the potential

relationship of debtor and creditor. In this case, the county could elect to forego the pursuit of the trust funds and come in as a general creditor, or it could pursue the funds to the extent that it could specifically trace them and then come in as a general creditor for the excess not recoverable. The county was, therefore, a creditor of the bank. It was also a creditor of the treasurer. The treasurer was indebted and obligated to the county for public money coming into his hands. The county could come against the official surety as well as against the depositary sureties who were security for its funds wrongly deposited in the bank. The fact that it had four sources of recoupment for public moneys, to wit, the treasurer, the official surety of the treasurer, the bank, and the depositary sureties, does not mean that the treasurer, one of its sources, is not also a creditor of the bank. The treasurer, being a creditor of the bank, could call upon its sureties to pay as they contracted. They contracted to pay the treasurer of Beaver county if the bank did not pay. That means they contracted to pay Farnsworth as treasurer. Contracts were meant to fulfill. If the depositary sureties do what they in law and good conscience should do, the treasurer will be in receipt of $25,000, which he must turn over to the county, and if he turns it to the county, the official surety will be required to pay that much less. The equities between the official and depositary sureties are not equal. The depositary sureties have a more primary duty. It is as if the treasurer had securities in his hands and refused to turn them over to the county. The official surety could insist that he either turn over or convert them and turn over the cash, or that it be substituted for the county if it paid the county what would have come to the county had the treasurer delivered the securities or the cash derived therefrom. The equities of the official sureties and the depositary sureties are on different levels—that of the former being paramount. Legally it is not the situation which we have in any of the cases cited by depositary sureties in their brief. It is not the case of two independent sureties of the

same creditor, nor is it the case of one surety of a debtor having turned to the creditor, its own security, as in the *Mooney* Case, supra. As we have seen, these cannot be reached by the co-surety or independent surety of the same debtor. He has no right to share in them as he would if the securities had come from the debtor. It is not the case of one surety having received indemnity from a party other than the debtor as in the *Leggett* Case, supra. In all those cases there was no equity in the surety who did not have the good fortune to have indemnity, to come against the surety who happened to be wise enough to obtain indemnity. The case at bar is one where the bank has a duty to furnish the treasurer with the public moneys which he must account for to the county. The bank failing to do that, the depositary sureties stand in its place, and it was their duty to furnish the treasurer with the equivalent of such public moneys up to the amount of their bond obligation. When they do that it is time enough to inquire as to their relative rights with respect to the official surety in reimbursing themselves from the assets of the bank. They stand next in line to the bank in the obligation to put the treasurer in funds. To the extent to which they failed to do that the official surety must respond. In order to work out a result which would have come about had they performed their duty, equity will permit the official surety to be subrogated. For those who enjoy the more technical analyses, the route of subrogation may go two ways. It may be said that the county is the creditor of the bank. The official surety pays the money which the bank should pay the county. The official surety is subrogated to all the rights of the creditor. One of the rights of the creditor county was the recourse to the bank or its sureties. The official surety is subrogated to that right. This analysis accepts the premise so laboriously endeavored to be established by the depositary sureties, i.e., that the county and not the treasurer was the real beneficiary of the depositary sureties' bond. Or coming through another route, the treasurer is the creditor of the bank and

the treasurer is the debtor of the county and principal on the official bond. The official surety pays his principal's debt; it is subrogated to the rights of the principal. It is, therefore, substituted for the principal in his right to collect against the sureties of the bank on their depositary bond. In one case it is subrogated to the rights of the county against the bank and its sureties; in the other case it is subrogated to the rights of its principal, also a creditor of the bank, and comes through its principal against the bank and its sureties.

But the depositary sureties say, even though ordinarily the official surety would be substituted for the county or the treasurer in its or his rights against the bank and its sureties in this case, such official surety is in this case at fault in that it knew its principal had wrongly deposited those funds, in fact committed a felony, and permitted him to do it. It acquiesced in the wrong. We are constrained to ask how far a surety must see that its principal acts legally or morally. Where it may be a material loser, it will, for the protection of its self-interest, strive to require him to follow the law. In this case, even though it may have thought it had exempted itself from liability for the payment of moneys lost through the failure of a bank, it, nevertheless, wrote on July 31st to the treasurer and directed him to withdraw all funds from the Beaver State Bank in excess of the amount secured by the depositary surety bond (at that time there was a depositary bond of $5,000 written by appellant which was later canceled) or "good collateral furnished to cover." The letter further says

"that if the County Commissioners wished to protect the county by taking the personal bond of the directors of the bank that is their affair, but as surety on your public treasurer's bond we cannot permit you to accept the same."

Farnsworth waited almost a month before answering to the effect that it was impossible for either of the local banks

to qualify as public depositaries and if he lived entirely up to the law the funds would have to be removed from the county where the local people would not get the benefit of their tax money. The letter further stated

"I know the directors personally and feel that each is responsible for the amount to which he has subscribed, making the public funds reasonably safe."

To this letter of Farnsworths, the appellant did not reply. The contention seems to be that the appellant owed the duty to pursue the matter, since it knew of the illegality, and if it did not succeed in compelling Farnsworth to do his duty, it should cancel the bond or go into equity to compel him to do his duty. Had it been a noncancellable bond, the latter would have been the only recourse. We do not think that such duty devolved on the surety. We do not think that under the facts of this case it can be said that the appellant acquiesced or participated in the fault or wrongdoing of the treasurer because it did not persist in making him faithfully perform his duties. The surety which binds itself to make good for the failure of its principal faithfully to perform his duty does not contract to make him perform it, nor can it be said that such surety is a participant in the wrongdoing of its principal, because it knew of the illegality. We have considered all of the cases cited by the respondent, and in every instance they were cases where either the surety insured the performance of an illegal act or one against public policy, or knowingly became the surety of a contract based on an illegal consideration, or knowingly indemnified a surety who had done one of these things. The principle that the law will leave the situation where it finds it and not assist a person to enforce or recover under a contract where a contract is illegal or provides for the performance of an illegal act or is based on a consideration which is itself illegal applies not only to the parties to the contract, but to all along the line who knowingly backed or assured the performance or the doing of such illegal act. It applies

to the surety or to the indemnifier of a surety. As stated in the case of *Western Indemnity Co.* v. *Crafts* et al. (C. C. A.) 240 F. 1, 7, any one who participates or takes part in any "essential step in a design to induce the treasurer" to deposit moneys illegally or any one who is a part of the purpose to promote an illegal act or enforce a contract based upon an illegal consideration regardless of whether such party is a direct contractor or, more remotely removed from the direct contractors, the law leaves them where it finds them. In this case, however, the official surety was not in any such position. He was not a party to any illegal contract, either directly or remotely. He was a surety on not only a legal contract, but one required by the law. In this case, the official surety and the depositary sureties are not in pari delicti. The fact that the surety does not act as a mentor of its principal's morality or does not pursue the task of making him faithfully perform the duty for the breach of which it is liable, does not create a situation wherein the equity shifts against the surety so as to deny it the right of subrogation.

In this case the depositary sureties not only knew that the deposit in their bank was illegal, but joined in securing such illegal deposit and induced it by giving the bond. They are now asserting that the surety on the official bond should not be subrogated so as to recover against ▮▮▮▮ them because it knew of the illegality and was so fearful of the condition of the bank that in September, 1931, it canceled its $5,000 depositary bond. The rule that one who performs an illegal contract cannot compel the other party to the contract to perform or recover from him is based on a policy of the law not to assist one whose claim must stand on an unlawful transaction. It acts as a deterrent against the making and the execution of unlawful contracts, but the refuge which a party to an illegal contract may resort to in order to protect himself against recovery will not be enlarged any further than necessary. In this case, where one set of sureties induced, participated in, and perpetuated an illegal

transaction, they are not to be protected against one who, at the most, can be said to have known of it and not taken active steps to end it. There is retribution enough to the official surety for not protecting his interest in being required to pay the county. He should not be further punished by withdrawing the right of subrogation when his fault was only that of failing to protect his own interest. Ordinarily a surety could not be subrogated to the rights of its principal against other parties where the claims of its principal against those parties rest upon an illegal contract with such parties. But this rule does not pertain where the right of its principal to which it claims subrogation is a right to recover public moneys. When the treasurer took a surety bond from the bank to insure the repayment of an illegal deposit, he would have the right not present in the ordinary case to sue the bank and its sureties for the return of the money because he acts as agent of the county and because the county is the beneficiary of the transaction. No amount of illegal diversion of public money or illegal transactions in relation thereto can defeat the right of the county or of its agent, the treasurer, even though he participated therein in recovering such money. Consequently, any one who has the right to be subrogated to the treasurer in his right to recover against the bank or its surety is not barred because the treasurer himself, together with the depositary sureties, were participants in the illegal transaction. We conclude, therefore, that the official surety has the right to recover against depositary sureties for any balance still owing on their bond; not, however, until the whole of the county's debt is paid. *United States* v. *National Surety Company*, 254 U. S. 73, 41 S. Ct. 29, 65 L. Ed. 143. In this respect, assignments 8, 9, 10a, 10b, 14, and 15 are sustained. The lower court was in error in refusing to give judgment in favor of the appellant against the depositary sureties. The judgment should have been rendered in favor of the appellant and against the respondent sureties, but conditioned on the county being first paid in full.

Lengthy as this opinion already is, we are called upon to determine several other questions lying between plaintiff and the bank commissioner, in which the respondents are not interested. To make these questions intelligible, the following facts which were stipulated are set forth.

On February 23, 1932, when the bank commissioner took charge of the bank, he took possession of $5,710. Said cash constituted a part of the funds of Beaver county and was, therefore, a trust in favor of the plaintiff. On the 2d day of December, 1931, before the bank closed, Beaver Bank was indebted to the Deseret National Bank in the sum of $15,000 secured by notes, and mortgages, a list of which need not be set out here, but which were set out in paragraph 14 of the complaint and in addition thereto mortgages of one Joseph Nous which were not set out in said paragraph, but which it was stipulated will be subject to the judgment in this case. During December, 1931, the bank paid to the Deseret National Bank an aggregate of $15,007.37. On each of the dates on which payments were made, the Beaver Bank had funds of Beaver county in excess of the funds it paid to the Deseret National Bank. In consideration of this payment of $15,007.37 the Deseret bank returned to the Beaver Bank the notes and mortgages put up as security for the loan. The court concluded that the plaintiff was entitled to judgment against the Beaver State Bank and the bank commissioner and the county treasurer and each of them in the sum of $61,651.99 *together with interest thereon against said bank and treasurer but not as to said commissioner*, at the rate of 8 per cent per annum from and after February 23, 1932. In its conclusion of law No. 3 and in paragraph 2 of the judgment, however, the court decreed that all cash paid to the plaintiff out of the trust fund to which we shall in a moment advert, should be applied by the plaintiff in partial liquidation of the principal indebtedness and *accrued interest*. The trial court further concluded that the $5,710 and *all* moneys paid on the promissory notes, or any of them, and all promissory notes and

mortgages described in the stipulation and which were put up as security for the $15,000 loan constituted a trust fund, and that the plaintiff was entitled to a decree declaring all of said money, notes, and mortgages to be impressed with the trust in its favor, and that all such moneys be paid to the plaintiff, and that all of said promissory notes and mortgages be delivered by the commissioner to the sheriff to be sold by the sheriff in the usual manner employed in conducting sales of personal property according to the laws pertaining to executions, all proceeds from such sales, after deducting proper costs to be applied in liquidation of the principal indebtedness of $61,651.99 and *accrued interest.*

The defendant commissioner had filed a demurrer to the complaint and at the same time filed a motion requesting the court to require the plaintiff to elect whether it would proceed as a general creditor of the bank and participate in any dividends and benefits on a party with all other general creditors, or whether it would claim as a trust claimant on specific funds in the hands of the defendant bank commissioner and thereby waive and disclaim all rights and benefits as a general creditor. All demurrers and motions were overruled and denied by the court. The bank commissioner cross-appealed and assigned as error the court's order overruling and denying the motions asking that the plaintiff be required to elect; the court's action in declaring that all moneys paid on the notes and mortgages and all notes and mortgages were to be a trust and to be delivered over by the commissioner to be applied upon the bank's indebtedness; the court's action in concluding and decreeing that the plaintiff should occupy the status of a general creditor after the application of the moneys realized from the trust fund had been applied on the balance of $61,651.99 *and accrued interest.*

The court committed no error in refusing to compel the plaintiff to elect as to whether it should file its claim as a general creditor or whether it would pursue specific funds

as a trust beneficiary. The bank was a trustee for
all deposits which could be traced and found remain-
ing in the hands of the bank when it closed its doors.
See *Sweet* v. *Montpelier Savings Bank & Trust Co.,* 69 Kan.
641, 77 P. 538; *Bailey* v. *Farmers' Bank of White Plains,*
227 Ky. 179, 182, 12 S. W. (2d) 312; *Gwynn* v. *Spurway*
(1928, D. C.) 28 F. (2d) 37, 39; *Sefton* v. *Farmers' State
Bank,* (1934) 138 Kan. 776, 779, 28 P. (2d) 752, 753; *State*
v. *Bank of Commerce of Grand Island,* 61 Neb. 22, 25, 84 N.
W. 406; *Slimmer & Thomas* v. *Meade County,* 39 S. D. 8, 9,
162 N. W. 536.

The plaintiff had the right to come into equity and have
returned to it specific property which belonged to it, and
after that it could file its claim as a general creditor for the
balance. The law does not require an election under
such circumstances. If I am the beneficiary under
a trust and the trustee converts certain portions of
the fund, I may obtain from him what is specifically mine
and come against his general assets as a creditor for that
which he cannot return. Until it can be determined how
much of my specific property he still has in his possession, I
am unable to know what is the amount of my claim for the
balance. In a sense, there are two causes of action: One to
obtain property which belongs to me, and the second to re-
cover judgment against the trustee for the property which
he cannot return. It is this balance for which the cestui que
trust puts in the claim. He pursues one remedy for the re-
turn of property belonging to him and after that another
remedy to obtain recovery as a creditor for the damages
arising from the inability to return all of his property.

The trust fund at no time constituted any part of the
bank's assets, and the bank nor any general creditor had
any right or interest in that fund. When that fund was
pursued and recovered, it took nothing away from
the general creditors of the bank because it did not
constitute a part of the bank's assets. See *Tooele*

*County Board of Education* v. *Hadlock,* 79 Utah 478, 11 P. (2d) 320. Cross-assignments 1, 4, and 5 are overruled.

The trial court erred when it decreed that all the moneys arising from the notes which were put up as collateral with the Deseret bank and all of the notes and mortgages themselves were impressed with the trust in favor of the plaintiff and should be turned over by the commissioner. There is no evidence that moneys belonging to the county are invested in these notes and mortgages. For aught that appears in the case, under the stipulation, these notes and mortgages belong to the bank. The trust funds of the county were used to redeem them from the Deseret bank. Public moneys in the bank with interest from the date of conversion were all that could be recovered. This is not the case where trust funds, unmingled with other funds of others, are invested in securities. In such case the beneficiary may elect to take securities with all the accruals or sue the trustee for conversion. In this case, the trust funds paid a debt due the Deseret National Bank. The notes and mortgages were collateral. The notes and mortgages are subject to be impressed with the trust only to the extent of $15,007.37, plus interest from the date of conversion. The trial court erred in decreeing that the plaintiff should occupy the status of a general creditor as against the assets of the bank to the extent of $61,651.99 and accrued interest, although it was correct in giving judgment against the bank and the beneficiary for that amount, plus interest. The question may in a sense be moot because the amount of trust funds recoverable and to be applied will probably not reach the principal of the indebtedness, to wit, $61,651.99, and the official surety would be liable for the judgment obtained against Farnsworth, with accrued interest. Consequently, when all of the moneys derived from the property impressed as a trust are applied to what is owing the county, the balance will have to be paid by the official surety, less, of course, anything which is paid by way of dividends or by the depositary sureties. However, in adding accrued in-

terest to the principal sum due to the county as claim against the assets of the bank as differentiated from judgment against Farnsworth, the bank or its stockholders, gives the county a larger base than it should have upon which to calculate its pro rata share of the dividends as against other general creditors of the bank. Interest does not run, as against the estate, after the assignment or declared insolvency, unless there are funds sufficient on hand to pay all of the demands and accrued interest; otherwise interest is to be allowed up to the time of the declared insolvency only. *Chemical National Bank* v. *Armstrong,* 59 F. 372, 8 C. C. A. 155, 28 L. R. A. 231. Cross-assignments 2, 3, 6, 7, and 8 are sustained.

The appellant complained in assignment 11 that the lower court made no finding in support of its conclusion in that it failed to find that the appellant executed and delivered a bond conditioned for the payment of any loss, costs, etc. The lower court only found that a bond, setting it out, had been executed and delivered. This was sufficient. That which appellant contends should be in the form of a finding is a matter of legal interpretation, which should be contained in a conclusion of law. Assignment No. 11 is therefore not well taken.

Judgment is, therefore, reversed, and the case remanded, with instructions to draw up findings, conclusions and judgment, in accordance with this opinion. As between the appellant and individual respondent sureties, costs are allowed the appellant. Costs in favor of the appellant and against Farnsworth are allowed but to include only that portion of the cost of the briefs devoted to the matter between appellant and Farnsworth. Costs are allowed to the bank commissioner as against the county, but in favor of the county as against the appellant. Such is the order.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

On Petition for Rehearing. (December 5, 1935.)

The defendant Home Indemnity Company and the Individual defendants filed a stipulation showing settlement of this action and asked for a rehearing and at the same time for modification of the opinion to comport with the stipulation. From the stipulation, it would appear ██ ██ that the settlement was made largely because of the filed opinion. We cannot grant a rehearing for the purpose of dropping out of the opinion parts unsatisfactory to counsel and leaving in other parts evidently satisfactory to counsel. If the opinion is to be modified, it should be modified because it fails correctly to state the law, or for some other reasons which makes its language or statements improper or inapplicable. The petition for rehearing seems now to be moot, but since counsel vigorously contend that we have fallen into error in certain regards, we have reconsidered the opinion in the light of the assistance given by counsel in their briefs on the petition for rehearing in order to be sure that no incorrect statements of law appear.

It cannot be gainsaid that the appellant Home Indemnity Company, in its original briefs and in its brief on petition for rehearing, puts up a strong argument against the holding that it must be held liable in spite of specific language in the bond by which it intended and sought to exempt itself from liability for the failure of the county treasurer to account for public moneys by reason of the failure of his depository bank.

We took the position that section 1492, Comp. Laws Utah 1917, should be considered as reading "The treasurer and his official surety shall be liable on his official bond for the safekeeping of public monies." Counsel for the appellant again call our attention to the cases cited in their original brief which hold that even if a statute requires an official bond to contain a condition and a bond is accepted which does not contain that condition, the surety is only liable to

the extent to which it has actually contracted to be liable unless there is, in addition, a statute (called a remedial statute) which provides that regardless of whether the bond contains the specified conditions required by statute, it shall be considered as if such conditions were contained therein. No case has been cited to us wherein the language of the statute specifically read that an official surety shall be liable on an official bond for losses of a specific character such as for county moneys. When the Legislature in effect said the surety of the county treasurer shall be liable on its official bond for the safekeeping of public moneys it said more than is said by those provisions contained in some of the states wherein it is specified that the officer shall give a bond conditioned that he will faithfully discharge the duties of his office. The Legislature said an official surety shall be liable for the safekeeping of public moneys. This means exactly what it says, that a surety shall be liable in any event. If it becomes a surety, the law immediately attaches which says it shall be liable for the safekeeping of public moneys, and this regardless of what it may say in its contract.

If we take the very type of remedial statutes which counsel says is necessary in order to permit the court to read the bond as if it contained no exemptions, we find the effect of the language in those statutes no stronger than the effect of section 1492, Comp. Laws Utah 1917. In Indiana, the mandatory part of the statute (Burns' Ann. St. 1933, § 3-25-12) reads as follows:

"But the principal and surety shall be bound by such bond, recognizance or written undertaking to the full extent contemplated by the law requiring the same, and the sureties to the amount specified in the bond or recognizance. In all actions on a defective bond, recognizance or written undertaking, the plaintiff or relator may suggest the defect in his complaint, and recover to the same extent as if such bond, recognizance or written undertaking were perfect in all respects."

We deem this language no more efficacious for holding the surety liable as far as the safekeeping of public moneys is concerned regardless of exemptions placed in its contract than the language reading "the surety shall be liable on the official bond for the safekeeping of public monies."

In Washington the statute (Rem. Rev. Stat. § 777) reads:

"No bond required by law, and intended as such bond, shall be void for want of form or substance, recital, or condition; nor shall the principal or surety on such account be discharged, *but all the parties thereto shall be held and bound to the full extent contemplated by the law requiring the same, to the amount specified in such bond.* In all actions on such defective bond, the plaintiff may state its legal effect in the same manner as though it were a perfect bond." (Italics supplied.)

Both of these statutes make the parties liable to the full extent contemplated by law regardless of whether the bond contains the condition required by law. The language of our statute stating that the official surety shall be liable on the bond for the safekeeping of public moneys is just as strong as saying that it shall be held and bound to the extent contemplated by law, that is, to the extent of being responsible for the safekeeping of public moneys.

The Idaho statute (Code 1932, § 57-816) reads:

"Whenever an official bond does not contain the substantial matter or conditions required by law, or there are any defects in the approval or filing thereof, it is not void so as to discharge such officer and his sureties; *but they are equitably bound to the state, or a party interested,* and the state or such party may, by action in any court of competent jurisdiction, suggest the defect in the bond, approval or filing, and recover the proper and equitable demand or damages from such officer and the persons who intended to become, and were, included as sureties in such bond." (Italics supplied.)

Here, again, the language "shall be liable for the safekeeping of public monies" is just as imperious a command that the surety's coverage must be considered in law as coextensive with the treasurer in that regard as if it had been

said "the official bond shall contain a condition that the treasurer and the surety shall be bound for the safekeeping of public monies and if the bond does not contain such a condition, the surety and treasurer shall nevertheless be liable." This last is the effect of the Idaho statute and is the effect of section 1492.

The Iowa statute says the following:

"No contract, stipulation, or condition limiting the liability created by said bond shall be of any force or validity." (Code Supp. Iowa 1913, § 1177-c)

The legislative mandate that the surety shall be liable on the official bond for the safekeeping of public moneys is equivalent to saying that it cannot by contract limit its liability in that regard, and that any stipulation, contract, or condition limiting the liability in that regard shall have no force or validity.

Summing up, as we stated in the original opinion, it is our opinion that section 1492, Comp. Laws Utah 1917, contains, by implication, the conception that the bond must provide for the safekeeping of public moneys, and that if it does not do so, the treasurer and the surety shall, nevertheless, be liable. While we do not deny a very good showing could be made for an opinion holding a different view, yet, we believe the conclusion to which we have come is the better reasoning, and therefore we adhere to the original opinion in that regard.

Counsel for the individual depositary sureties vigorously assail our opinion as respects subrogation. The appellant surety company thinks we are right with respect to our views in regard to its claimed right to be subrogated, but wrong in our interpretation of sections 1492 and 4310, Comp. Laws Utah 1917. The individual sureties, on the other hand, think we were right in regard to our interpretation of sections 1492 and 4310, but wrong in our conclusions

to the effect that the official surety may be subrogated. For the reasons as stated above, both parties, including the treasurer himself, have joined in this petition for rehearing. In spite of the fact that the former opinion was very lengthy, counsel for the individual depositary sureties think we have not given sufficient consideration to some of the questions. They state that we departed from the stipulation of facts when we remarked, "In this case the depositary sureties not only knew that the deposit in their bank was illegal, but joined in securing such illegal deposit and induced it by giving the bond." It is pointed out that the deposits were made in the bank under a depository bond for $5,000 given by the appellant long before these individual depositary surties executed their bond. If these individual sureties did not secure or induce such illegal deposit, they certainly secured or induced the continuance of the deposit, for the treasurer undoubtedly would not have kept the deposit in the bank without some depository bond. The treasurer continued to maintain and put in further deposits on the strength of the bond. Counsel can hardly complain, therefore, that the language is too strong, although we did not mean to indicate, as stated in counsel's brief, that the individual depositary sureties had any sinister motive in so doing. What we intended to say in the opinion, and what we now explicitly say, is that when the individual sureties agreed to pay the treasurer up to $25,000 in case the bank failed to pay him on demand public deposits placed therein, they made a contract which was intended to be fulfilled, and if fulfilled would have placed in the treasurer's hands that sum of money for which the official surety would thus not have been liable. The equities of the official surety and the individual depositary sureties are not equal. If A contracts to pay B moneys if C, who owes B does not pay him, A should be made to fulfill his contract without regard to the fact that if B cannot obtain them from A to pay D to whom the moneys really belong, a surety of B will have to pay D. A cannot relieve himself from his contract on the theory

that he can make B's surety pay D. The surety has the right to say to B, "Collect from A what A said he would pay and put yourself in possession of at least that much of D's funds and I will respond for the difference. If you do not do so, the law will put me in your place and let me collect from A in order that I may to that extent recoup myself for the amount I paid D."

An official surety agrees to respond for damages to the county due to failure of the treasurer safely to keep the public moneys, but where the treasurer has a security or recourse by which he may recover some of these public moneys, the official surety will be subrogated to ■ that recourse. It seems to us the very statement of the propostion reveals the relative equities between the official surety and the depositary sureties and reveals the fact that their equities are not equal.

The depositary sureties claim we did not sufficiently consider the question of the appellant's alleged negligence—really a claimed indiligence—in not compelling the treasurer, its principal, to obey the law. We think we made it sufficiently plain that the surety had no such ■ duty, at least as far as the depositary sureties are concerned, to force the treasurer to take the county funds out of the bank where they illegally reposed so as to relieve the depositary sureties of the consequence of the obligation which they took to pay the treasurer if the bank did not. A says to B, "If you deposit money with C, I will pay you if C does not." A is hardly in a position to say to B's official surety, "You should have made B withdraw his deposit from C even though as an inducement to keep funds on deposit with C, I gave a depository bond, and since you did not do so, I, who have guaranteed B against loss from C, may resist your subrogation to be put in B's place to recover from me, even though had I fulfilled my contract with B there would be no need of your being subrogated." The consequences of the official surety's indiligence, if any, were fully

visited upon it and existed when it suffered by a matured liability. It may owe itself a duty to be diligent in order to save itself from loss, but it does not owe a duty to those who have guaranteed to pay if moneys illegally deposited in the bank are not paid over, to require such moneys to be withdrawn. *Walker Realty Co.* v. *American Surety Company*, 60 Utah 435, 211 P. 998, 1015, did not say it was the duty of the surety to see that its principal performed his contract, but that "it was to its *interest* to see that its principal performed its contract." This is exactly as we stated in the original opinion. It is as if the depositary sureties were saying, "We guaranteed to pay the treasurer if the bank did not, but the monies were illegally deposited and we guaranteed that an illegal deposit would be repaid, however, you, Mr. Official Surety, should have been diligent enough to have insisted that the deposit which we guaranteed should have been withdrawn because you knew it was illegal and thus saved us from the situation in which we now find ourselves."

In the original brief, the individual depositary sureties cited some excerpts from cases which, in effect state that where a person who claims the right of subrogation has been negligent, equity will not extend to him the benefits of the principle of subrogation. In our opinion we did not analyze these cases because we thought it was plain and clear enough that they did not apply in the instant case. They are all cases in that category where a person claims to be subrogated to one having a prior lien because he has advanced money to pay off that lien. A subsequent lienholder moved ahead when the prior lien was discharged, and such subsequent lienholder contended that the person claiming the right of subrogation was negligent in not looking up the record before he paid over the money which discharged the prior lien. The courts in some cases so held, but we believe by the weight of authority even in such cases the person paying the money to discharge a lien with a promise that he would be substituted for that lienholder is not barred

from subrogation because of an alleged negligence in failing to look up the record, especially where he relies upon the statement of the debtor that there are no subsequent liens. See *Hughes Company* v. *Callahan*, 181 Ark. 733, 27 S. W. (2d) 509; *Kent* v. *Bailey*, 181 Iowa 489, 164 N. W. 852; *Home Savings Bank of Chicago* v. *Bierstadt*, 168 Ill. 618, 48 N. E. 161, 61 Am. St. Rep. 146; *Jackson Trust Co.* v. *Gilkinson*, 105 N. J. Eq. 116, 147 A. 113; *Emmert* v. *Thompson*, 49 Minn. 386, 52 N. W. 31, 32 Am. St. Rep. 566; *Hill* v. *Ritchie*, 90 Vt. 318, 98 A. 497, L. R. A. 1917A, 731; *Seeley* v. *Bacon* (N. J. Ch.) 38 A. 139; *Gore* v. *Brian* (N. J. Ch.) 35 A. 897; *Federal Land Bank of Springfield* v. *Smith*, 129 Me. 233, 151 A. 420; *Louisville Joint Stock Land Bank* v. *Bank of Pembroke*, 225 Ky. 375, 9 S. W. (2d) 113; *Merchants' & Mechanics' Bank* v. *Tillman*, 106 Ga. 55, 31 S. E. 794; *Fifield* v. *Mayer*, 79 N. H. 82, 104 A. 887; *Bormann* v. *Hatfield*, 96 Wash. 270, 164 P. 921, L. R. A. 1917E, 1052; *Geib* v. *Reynolds*, 35 Minn. 331, 28 N. W. 923; *Wallace* v. *Benner*, 200 N. C. 124, 156 S. E. 795; *Di Giovanni* v. *Giliberto*, 139 Misc. 616, 248 N. Y. S. 82; *Southern Cotton Oil Co.* v. *Napoleon Hill Cotton Co.*, 108 Ark. 555, 158 S. W. 1082, 46 L. R. A. (N. S.) 1049; *Farm Land Mortgage & Debenture Co.* v. *Elsbree*, 55 Kan. 562, 40 P. 906; *Lanier* v. *Milliken*, 25 Misc. 59, 54 N. Y. S. 424; *Geo. A. Hoagland & Co.* v. *Decker*, 118 Neb. 194, 224 N. W. 14; *Miller* v. *Scott*, 23 Ohio App. 50, 154 N. E. 358.

But in this case we have no such situation as the type of cases from which the excerpts in respondent's brief were taken. It is one thing to say that equity will not grant the right of subrogation to one who has paid money on a promise that he will be substituted for a certain lienholder as security for the advancement of his money as against a subsequent lienholder when the person so advancing the money has been negligent in failing to search the record, but it is quite another thing for a depositary surety who has agreed to pay the treasurer moneys which the latter illegally deposited in a bank in case the bank does not pay him, to say

to the official surety of the treasurer, "You have been indiligent in permitting to remain in the bank illegally the very moneys the repayment of which we guaranteed." In one case a subsequent lienholder who has not in any way been implicated in the transaction and who has no obligation to pay is permitted fortuitously to benefit as against one who pays off a prior lien because of the payor's negligence in not searching the record before he paid over the money, whilst in the instant case the depositary sureties who have obligated themselves to pay in case the bank does not, are seeking to free themselves of the duty to pay by claiming that the official surety asking the court to permit it to pursue them should not be allowed to do so because it did not persist in requiring its principal to withdraw the moneys illegally deposited when they themselves had guaranteed that deposit. The first case involves conventional subrogation; the latter and instant case legal subrogation.

The respondent depositary sureties complain that we did not render any opinion as to the order of priority, if any, between appellant and the individual depositary sureties in regard to the bank's assets after the plaintiff has been paid in full. We find no assignment of error by either party attacking the court's finding in that regard. Nowhere in the briefs was it argued. We did state in the opinion to the effect that it was time enough to inquire as to the relative rights of the depositary sureties and official surety in reimbursing themselves from the assets of the bank after both had done their duty under their contracts. This was because we did not feel called upon by anything in the assignments to determine whether the depositary sureties would stand in the place of the treasurer against the bank if they paid the indebtedness of his debtor, the bank. We were called upon to determine whether the official surety was subrogated to the county or the treasurer against the depositary sureties. We had no call to determine whether the depositary sureties would be subrogated to the treasurer

as against the bank if they paid so as to put them on an equal basis with the official surety for recoupment as against the assets of the bank. The fact that the official surety and the depositary sureties are not on the same level and that the equities are unequal between them when it comes to the question of whether the official surety should be subrogated as against the depositary sureties, does not necessarily affect the question as to whether if both the official surety and the depositary sureties respond to their obligations they may not be on an equal plane in recouping themselves from the bank. However, from the stipulation, it appears that the question is now moot and so need not be decided.

The fourth ground urged for a rehearing by the depositary sureties is that we were in error in holding that the official surety could stand in the place of the county as against the depositary sureties when the county's right to recover was because a sovereign cannot be barred from collecting its own funds on account of its agent entering into an illegal contract. The contention is that the immunity which the county has from the rule that one who has entered into an illegal contract will not be given the benefit of the courts to enforce it, does not extend to the surety of the agent of the county where that agent has entered into an illegal contract. The error in this contention lies in the fact that the surety was not surety for the performance of an illegal contract. True, as stated in the opinion when A and B contract to do an illegal thing, neither A nor B can enforce or recover upon the contract, nor can the surety for the performance of it, nor an indemnifier of the surety recover from their respective obligors if they pay. All along the line, any one engaging or participating in or going surety for such contract may defend against enforcement or recovery on the ground of illegality. But a surety who guarantees the payment of a loss to the county or any other person because of failure of that person's agent faithfully to perform, is not a party to, participant in, or surety

for, an illegal contract. Because the method of failure to faithfully perform, causing a loss, involves illegality does not make the surety an insurer of an illegal contract, nor does mere failure of a surety to insist that its principal desist from the illegality make such surety a participant. That may be indiligence, the effect of which we have already considered. In this case the surety's contract was not only legal, but required by law. The illegal act of the treasurer by which he committed a breach of his duty faithfully to perform his duties came after the surety's contract. It was not the illegal contract of putting the money in the bank without the required legal safeguards which the surety guaranteed. The surety agreed only to make good losses regardless of whether they arose from neglect, bad judgment, or illegal acts. It would be quite inconsistent for the law to require an officer to obtain a surety for the faithful performance of his duties and then hold that if there was a breach of the faithfulness of his performance by his doing an illegal act, that the surety was a party and participated in such illegality and could not recover through subrogation. The difficulty with respondents is that they have confused a contract of a surety to pay a loss due to unfaithful performance whether by an illegal act or neglect and a surety who guarantees or insures the doing of something which is itself illegal.

We find nothing in the petition of the respondent Farnsworth which has not been fully considered in the former opinion or which in any way points out error in that opinion. We have gone into this matter again somewhat at length because of the reason that if there were matters in the former opinion about which there was doubt, we thought it best to clear them up.

The petitions for rehearing are denied, and the former opinion is adhered to.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.