EMPEY et al. v. INDUSTRIAL COMMISSION OF UTAH et al.
SNOW v. SAME.

Nos. 5778, 5779.  Decided January 4, 1937.  (63 P. [2d] 630.)

*Gustin & Richards,* of Salt Lake City, and *David H. Morris,* of St. George, for plaintiffs.

*Joseph Chez,* Atty. Gen., *F. A. Trottier,* of Salt Lake City, and *J. W. Cherry,* of Cedar City, for defendants.

ELIAS HANSEN, Chief Justice.

Each of the plaintiffs herein applied to the Industrial Commission of Utah for compensation which was denied, whereupon the causes were brought to this court for review. Both causes grow out of the same accident. When presented to this court the causes were consolidated. We shall dispose of both of them in this opinion. Compensation was denied for these reasons: (1) That neither the husband of plaintiff Mattie Empey nor plaintiff Rosamond Snow was in the employ of the Escalante Explorations, Inc., hereinafter referred to as Escalante Company, at the time of the accident resulting in the death of Mr. Empey and the injury to Miss Snow; (2) that the death of Mr. Empey and injury to Miss Snow were not covered by the insurance policy relied upon for recovery because such policy excluded from its coverage injuries sustained in the "shooting of wells." The commission denied Mrs. Empey compensation upon the additional ground that she accepted 3,500 shares of the capital stock of the Arrowhead Petroleum Corporation, hereinafter referred to as the Arrowhead Company, in full settlement of her claim for the death of her husband. There is no substantial conflict in the evidence. Following is a summary of the material facts: On March 6, 1935, a premature explosion occurred while dynamite was being prepared to shoot the Escalante well, which was located

about seven miles south of St. George in Washington county, Utah. As a result of the explosion, Joseph Empey, Jr., husband of plaintiff Mattie Empey, was killed, and plaintiff Rosamond Snow lost the entire sight of her left eye and was otherwise disfigured and injured so that she was rendered totally disabled from the time of the accident to the date of the hearing before the commission. When killed Mr. Empey was assisting with the work, preparatory to the shooting of a well. Miss Snow was, at the time, performing duties of a clerical nature. At the time of the explosion the State Insurance Fund was the insurance carrier of a policy of insurance in which the Escalante Company was the assured. The policy of insurance contained this provision of coverage:

"Oil or Gas wells—Development—including erection and dismantling of derricks, drilling of new wells and drilling of old wells deeper, installation of casing and of pumping machinery, cementing, and Drivers, Chauffeurs and their Helpers—excluding the Shooting of Wells."

The well where the explosion occurred was located on public land. The Escalante Company held a permit from the Federal Government to drill for oil and gas on the land where the well was located. The commission took the view that while the Escalante Company held the permit to drill the well where the explosion occurred, it was the Arrowhead Company that did the shooting thereof at the time of the explosion and that Mr. Empey and Miss Snow were employed by the latter, and not the former company. Touching the relation of these two companies to each other and to the employees who were doing the work at the time of and prior to the explosion, the evidence shows that the Escalante Company was incorporated in 1930. For a time it conducted drilling operations under government permits which it held. After two wells had been drilled without developing any oil or gas the stockholders of the company apparently became discouraged and refused to advance any more money to de-

fray the expenses of the company. In 1933 Le Roy H. Cox, Warren Cox, and Melvin Cox, brothers, were the record owners of more than 51 per cent of the outstanding capital stock of the Escalante Company. In July of that year they entered into a written contract with the Arrowhead Company. By the terms of that contract Cox Brothers agreed to sell to the Arrowhead Company 51 per cent of the outstanding capital stock of the Escalante Company. The stock was to be placed in escrow to be delivered to the Arrowhead Company upon its compliance with the contract. In payment for the stock the Arrowhead Company was to deposit $25,000 in the St George Bank at St. George, Utah. The money so deposited was to be used to sink to a greater depth a well which the Escalante Company had theretofore drilled to a depth of about 3,600 feet. That well, so the contract provided, should be drilled to production or to a depth of 6,200 feet, or to granite. If the $25,000 was not sufficient to complete the well or to drill an additional well to test the "Bloomington dome," the Arrowhead Company was to supply such additional money as was necessary to accomplish that purpose. The money to be deposited at the St. George Bank was to be placed in a special trust account in the name of a representative of the Arrowhead Company and Le Roy H. Cox, or some one designated by the Escalante Company. The money in the trust fund was to be drawn for the purpose of developing the Escalante property. Any money drawn from the trust fund account must be approved by the trustees or their successors. The drilling, so the contract provided, was to be done by the Arrowhead Company. Cox Brothers, or their successors, retained the right to inspect the drilling operations and have an engineer and geologist inspect the hole, to be present at times of tests, and at such times as shooting occurred of the well. The Escalante Company was to be reorganized. The Arrowhead Company was authorized by the contract to name the board of directors of the Escalante Company provided that one of the Cox Brothers or a person named by them, should be a member

of the board of directors of the Escalante Company. The other provisions of the contract bear but remotely, if at all, on the questions which are here presented for determination. Pursuant to the foregoing contract the Escalante Company was reorganized and drilling operations were commenced and carried on until the occurrence of the explosion here brought in question. Le Roy H. Cox acted as one of the trustees of the fund deposited in the trust account at the St. George Bank. The other trustee of that fund was Ellis J. Pickett, who was president of and who represented the Arrowhead Company. Messrs. Cox and Pickett continued to act as trustees of the fund from its inception up to the time of the explosion. Under date of August 16, 1933, Charles D. Alsop, secretary and treasurer of the Arrowhead Company, wrote the following letter to the State Insurance Fund:

"The Escalante Well is being placed in a shape for drilling again and we will require a compensation policy on the men who will be employed at that well.

"We are hereby applying for coverage on this well, the policy to be made in the name of LeRoy H. Cox and Ellis J. Pickett, Trustees of Special Trust Fund for the development of the Escalante Well.

"If you will kindly send the necessary forms for filing application and estimated payroll we will complete at once and mail to you."

On August 18, 1933, the State Insurance Fund in answer to the letter of Mr. Alsop said:

"In accordance with your request of August 16th, we hand you herewith application for Workmen's Compensation Insurance to cover the operations of the trustees drilling the Escalante Well, which we will be pleased to have you complete, sign and return."

The application for insurance was signed and mailed to the State Insurance Fund together with a check for $120 in payment of the first premium. On September 8th a workmen's compensation policy was issued by the commission, in which policy the State Insurance Fund was made the insurance carrier and Le Roy H. Cox and Ellis J. Pickett,

trustees, were named as the assured. The following letter accompanied the policy:

"We hand you herewith the above numbered policy, effective as of 12:01 A. M., August 31, 1933, together with certified official receipt to cover your check of $120,00 in payment of the Minimum Premium, for which we wish to thank you.

"Please advise your employes that, under the Law, all accidents must be reported to you within 48 hours to receive full benefit, and we will appreciate immediate first report of injury from you In Duplicate, which the law says must not, under any circumstances, be rendered later than seven days after the date of the injury.

"Thanking you for your kindness, we beg to remain."

Under date of November 27, 1933, the attorney who, under the direction of the commission, was attending to legal matters connected with the State Insurance Fund, wrote to Messrs. Cox and Pickett a letter in which it was stated that:

"In attempting to clear up certain misunderstanding which we have in this office regarding the above numbered policy, I have been instructed to write each of you individually.

"This policy was issued by the State Insurance Fund on August 31st, 1933, in the name of LeRoy H. Cox and Ellis J. Pickett, Trustees. Nowhere in your application nor in the correspondence regarding this policy is it stated what you are trustees of other than the phrase contained in the letter of Mr. Chas. D. Alsop that you are trustees for a Special Trust Fund for the development of the Escalante Well. It is necessary for us to determine when and how you became trustees, whether by appointment by some court or by action of some board of directors, or whatever other procedure was taken to constitute you trustees.

"From the letterhead of Mr. Dixon's letter dated August 29th, 1933, it appears that you are trustees of the Arrowhead Petroleum Corporation.

"We shall be interested in being informed as to what the present status of the Arrowhead Petroleum Corporation is.

"Hoping that you will let us have this information at your earliest convenience."

On December 4, 1933, Mr. S. L. Dixon, auditor of the Arrowhead Company, answered the letter of November 27,

1933. In that letter, which was on stationery containing the letterhead of the Arrowhead Company, Mr. Dixon said:

"In reply to your letter to LeRoy H. Cox and Ellis J. Pickett regarding Policy C-324 will explain the trusteeship in question. The Arrowhead Petroleum Corporation entered into a contract with the Escalante Explorations, Inc. July 26th, 1933 for the development of properties belonging to the latter company. The funds for this work were provided through a contract made by the Arrowhead Petroleum Corporation with the Arrowhead Petroleum Syndicate, Inc. of New York. In the agreements between these various companies it was provided that the Board of Directors of the Arrowhead Pet. Corporation and the Board of the Escalante Explorations, Inc. were to appoint an officer from each company who would have the power to receive and disburse funds, acquire property, and direct the development of the properties owned by the Escalante Explorations, Inc. The Arrowhead Company appointed Ellis J. Pickett and the Escalante Explorations, Inc. appointed Judge LeRoy H. Cox. They employ the drilling crews, etc., and pay them and neither of the above corporations enter into the matter.

"The Arrowhead Petroleum Corporation is not operating at present nor is the Escalante Explorations, Inc."

On December 11, 1933, the attorney for the State Insurance Fund wrote a letter addressed to Le Roy H. Cox and Ellis J. Pickett, in which he said:

"Referring to our letter to you of November 27th, we received a reply to it in a letter received from Mr. S. L. Dixon, auditor for the Arrowhead Petroleum Corporation, from which I presume that you merely referred the letter to Mr. Dixon for his attention. His reply confirms a previous notion which we had that you two trustees are agents for the Arrowhead Petroleum Corporation, or at least, that Mr. Pickett is agent for the Arrowhead Petroleum Corporation, and Judge Cox is agent for the Escalante Explorations, Inc.

"With these facts in mind our interpretation of the above numbered policy is that it was issued in the wrong name, and it should have been applied for and issued in the name of these two companies in the conjunctive and alternative instead of, and in the names of Judge Cox and Mr. Pickett. It will therefore be necessary for the policy to be either cancelled or re-written with the proper name of the insured.

"Will you please let us have your confirmation of such an arrangement."

On December 19, 1933, Ellis J. Pickett wrote to the attorney for the State Insurance Fund the following letter:

"Your letter of the 11th received relative to policy No. C-324 which has been issued in the name of LeRoy H. Cox and Ellis J. Pickett as Trustees. I do not believe the Arrowhead Petroleum Corporation can be classed as an employer in this instance though the Escalante Explorations, Inc. could be termed an employer.

"The Arrowhead has entered into a contract of sale with the Escalante Explorations for the purchase of capital stock in the latter company. One of the provisions of the contract is that the money paid by Arrowhead for this stock shall be used for the development of the Escalante Well. I serve as a trustee to insure that the money is used for the purpose intended. It would be alright to have the policy changed to the Escalante Explorations, Inc. instead of Mr. Cox or myself but since Arrowhead is merely acquiring a stock interest the policy should not be issued in its name   *   *   *."

On December 28, 1933, the manager of the State Insurance Fund wrote the Escalante Company as follows:

"We hand you herewith endorsement changing the name of the Assured under our policy of the above number in accordance with the information furnished by Mr. Pickett's letter of December 19, 1933 to Mr. F. A. Trottier, Attorney.

"In making this change of name of the assured it is our understanding that LeRoy H. Cox is an employe of the Escalante Explorations, Inc., and any salary or wages allowed to him must be reported on your semiannual payroll report. We will consider Mr. Pickett, however, an employe of the Arrowhead Petroleum Company.

"Please attach this endorsement to your policy, and oblige."

On January 4, 1934, Mr. Le Roy H. Cox wrote to the attorney for the State Insurance Fund the following letter:

"I have your letter of December 11th, in regard to Policy C-324. Will say that I am not connected with the Arrowhead Petroleum Corporation, and that the Trust Fund and the property over which I have jurisdiction does not have anything to do with the Arrowhead Corporation.

"I suggest that you take the matter referred to in your letter up with the Arrowhead."

The indorsement mentioned in the letter of December 28, 1933, changed the name of the assured in the policy from Le Roy H. Cox and Ellis J. Pickett, trustees, to the Escalante Company. It was attached to and made a part of the policy. From that time until the explosion occurred the premium was paid and the policy remained in effect with the Escalante Company named therein as the assured. There was received in evidence correspondence between the State Insurance Fund and the Arrowhead Company from which it is made to appear that there was a dispute between them as to premiums. The Insurance Fund claimed that the Arrowhead Company was owing $104.11 on a policy written some years ago by the Insurance Fund. The Arrowhead Company claimed that it was not owing the Insurance Fund any premiums. That correspondence lends some support to the contention of the Industrial Commission that the reason for the parties interested in the Escalante well requesting that the insurance policy be issued in the name of the Escalante Company was to escape the payment of $104.11 premiums which the commission claimed the Arrowhead Company was owing to the State Insurance Fund. We are not advised as to the merits of that controversy. In any event, the controversy cannot effect the results that should be reached in the causes under review. The evidence is all to the effect that the Escalante Company was not employing any workmen other than those connected with the drilling of the Escalante well. So, also, does the evidence show without conflict that the policy here relied upon by plaintiffs was issued as a coverage for the workmen engaged in the operations incident to the development of the Escalante well where the explosion occurred. During all of the time that work was being carried on at the Escalante well, the officers of the Escalante Company were also officers of the Arrowhead Company excepting Le Roy H. Cox, who was at all times an officer of the Escalante Company, but at no time was he an officer of the Arrowhead Company. The two companies jointly maintained an office at St. George, Utah. One set of

books was kept for both companies. In such books, however, the expenditures of operating the Escalante well were charged to the Escalante Company and were segregated from the other expenditures of the Arrowhead Company; 51 per cent of the salary paid to the office help was charged to the Escalante Company and the remaining 49 per cent to the Arrowhead Company. There is some apparent conflict in the evidence as to whether the operations at the well were directed by the board of directors of the Escalante Company or the board of directors of the Arrowhead Company. Such conflict, however, arises because some witnesses were permitted to testify that the board of directors of the Escalante Company directed the operations, others that such operations were conducted under the direction of the board of directors of the Arrowhead Company. In light of the fact that most of the members of the board of directors of the two companies were the same, it is easy to understand why there should be difficulty in determining in what capacity the board of directors were acting at a given time. The record of the minutes of the board of directors of the Escalante Company was received in evidence from which it appears that only two meetings of that board were held during the entire time operations were being carried on at the Escalante well. Apparently at neither of those meetings was anything done by the board of directors of that company affecting the operations at the well. There is some evidence that other meetings were held but no minutes kept thereof. The checks given in payment of the workmen, for premiums owing the State Insurance Fund and for materials used, etc., were all drawn by the Arrowhead Company. It is further made to appear that on three occasions prior to the explosion the State Insurance Fund paid compensation to workmen injured while working on the well.

It was upon substantially the foregoing evidence that the commission found that neither Mr. Empey nor Miss Snow was, at the time complained of, an employee, of the Escal-

ante Company, and therefore neither the Escalante Company not its insurance carrier, the State Insurance Fund, was liable for the payment of compensation. It is reasonably clear that the foregoing evidence is sufficient, if, indeed, it does not require a finding that Miss Snow and Mr. Empey were employees of the Arrowhead Company and not of the Escalante Company at the time of the explosion. Such fact, however, contrary to the contention of defendants, is not determinative of this controversy. Defendants earnestly urge that the doctrine announced by this court in the case of *Continental Casualty Co.* v. *Industrial Commission*, 61 Utah 16, 210 P. 127, 129, necessarily relieves them from all liability to pay compensation to plaintiffs; that when it is once determined that the Escalante Company was not the employer of those who were injured by the explosion, the plaintiffs are precluded from recovering compensation from either the Escalante Company or the State Insurance Fund. The facts in that case, so far as material here, are that a Mr. R. M. Pope was operating a mine owned by the Elaterite Varnish & Rubber Company under a contract by the terms of which Mr. Pope was to receive $55 per ton for ore taken from the mine and delivered to a railroad shipping point for the rubber company. All of the expenses of the mining and delivery of the ore at the shipping point were by the contract to be borne by Mr. Pope. He was a stockholder in the rubber company. No one was employed by the rubber company in Utah. Mr. Pope applied to an agent of the Continental Casualty Company for an insurance policy to cover the men who were employed by him. The policy was written by an agent of the Continental Casualty Company in which the Elaterite Varnish & Rubber Company was named as the assured. A workman of Mr. Pope's was killed, and his dependents sought to hold the Continental Casualty Company liable for compensation. This court held upon these facts that the Continental Casualty Company was not liable. In the course of the opinion it was said:

"The Industrial Commission is an administrative body. It is not vested with power to reform a contract or to make a new contract to conform with the intent of the parties. That power belongs to another forum. * * * The commission was without authority to construe and apply the contract of insurance to include or cover workmen in the employ of either an individual or corporation not named as the insured in the policy of insurance. It follows, therefore, that the award made by the commission must be annulled."

While some of the facts of that case are analogous to those here involved, still there are a number of differences which we deem of controlling importance. The Industrial Commission is in control of the State Insurance Fund. The policy as originally written designated Le Roy H. Cox and Ellis J. Pickett as the assured. The employees of the commission who were in the active management of the State Insurance Fund sought and were furnished information as to the nature of the trusteeship of Mr. Cox and Mr. Pickett. While the contract between Cox Brothers and the Arrowhead Company was not forwarded to the attorney for the State Insurance Fund, the general purport thereof was furnished. Doubtless, if a request had been made for the contract it would have been supplied. While Messrs. Pickett and Cox misconceived the legal relation created by the contract and operations conducted pursuant thereto between the two companies and those employed as workmen on the Escalante well, still the insurance carrier was informed as to the facts upon which such conclusions were based. From the information furnished, those in charge of the State Insurance Fund were apparently satisfied that a policy designating the Escalante Company as the assured would give protection to those engaged in working at and in connection with the development of the Escalante well. The workmen so engaged were, at the suggestion of the State Insurance Fund, apparently so informed. Under such a state of facts, neither the Escalante Company nor the State Insurance Fund should be permitted to escape liability. To deny the injured employees compensation merely because

those who drew the policy with knowledge of the facts misconceived the legal relations of the parties flowing from such facts would work a grave injustice to the injured employees without any fault on their part. In the case of *Burke* v. *Industrial Commission,* 75 Utah 441, 286 P. 623, it was said:

"The legal relations of the parties, however, is a contractual one, and is to be deduced from the whole of the contract and the intention of the parties. Clearly, the parties intended to create a situation whereby Burke & Co. would be responsible for compensation to any workman engaged in the painting job who might be injured. To accomplish this end they agreed that both Anderson and the other workmen engaged in the painting job should be formally and expressly recognized and designated as employees of and their wages paid by Burke & Co. We think it was competent for the parties to enter into such an agreement, and that the result of it was to constitute Burke & Co. the employer of the workmen, at least for the purposes intended. The insurer of Burke & Co. can have no valid objection to the arrangement."

In this case, as shown from the correspondence which we have heretofore set out somewhat in detail in this opinion, the officers of the Escalante and the Arrowhead Companies, together with the attorney for the State Insurance Fund, with full knowledge of the facts, in effect agreed that for the purposes of insurance the workmen employed at and about the Escalante well should be treated as the employees of the Escalante Company. Here, as in the case of *Burke* v. *Industrial Commission,* supra, the insurance carrier suffered no prejudice by the arrangement. It is suggested by the defendants that the Insurance Fund was prejudiced because no policy would have been issued to the Arrowhead Company until that company paid the premium of $104.11 claimed to be owing upon another policy. Whether such amount was or was not due as heretofore indicated in this opinion we are not advised. Whatever may be the merits of that controversy, the record in this case conclusively shows that those in charge of the State Insurance Fund knew that the Arrowhead Company was interested in the drilling being prosecuted at the Escalante well. If the management of the fund

desired to be more fully advised as to the nature of such interest, a request should have been made therefor. Notice of the fact that the Arrowhead Company was interested in the drilling of the Escalante well was notice of all that would have been discovered upon further inquiry. The facts of this case bring it within the doctrine announced in the case of *Burke* v. *Industrial Commission,* supra. Neither of the defendants can escape liability because the Escalante Company rather than the Arrowhead Company was named as the assured in the policy involved in this controversy.

The next question upon which the parties divide is whether or not the provision excluding the "shooting of wells" from the coverage of the policy is fatal to plaintiff's claimed right to recover from the State Insurance Fund. Our Workmen's Compensation Act provides that:

"Every employee mentioned in section 42-1-41 who is injured, and the dependents of every such employee who is killed, by accident arising out of or in the course of his employment, wheresoever such injury occurred, provided the same was not purposely self-inflicted, shall be entitled to receive, and shall be paid, such compensation for loss sustained on account of such injury or death, and such amount for medical, nurse and hospital services and medicines, and in case of death such amount of funeral expenses, as is herein provided." R. S. Utah 1933, 42-1-43.

An insurance policy written by the State Insurance Fund accords employees the same protection as does a policy written by a private insurance carrier. R. S. Utah 1933, 42-1-48. The Workmen's Compensation Act also permits a recovery where injury or death results from the wrongful act of a third person. R. S. Utah 1933, 42-1-58. That an employer subject to the act may not by contract or otherwise escape liability to pay compensation to an injured employee, or in case of death to his dependents, is not open to serious doubt. An employer may, with the approval of the commission, provide compensation or benefits other than those fixed by the act when and only when such other benefits are at least equivalent to those fixed by the act.

R. S. Utah 1933, 42-1-50. This and other provisions of the act clearly indicate a legislative purpose to make it certain that injured employees, or in case of death, their dependents, will secure the benefits of the act. The provisions thereof requiring that employers, other than self-insurers, must carry insurance is calculated to accomplish that purpose. If employers and insurance carriers are, by an agreement between themselves, permitted to exclude from the coverage of a policy a part of the hazard incident to conducting a business, then as to such excluded hazard the business is being conducted without insurance contrary to the act. If one hazard of a business may be excluded from a coverage of a policy, then by the same line of reasoning two or more hazards may be excluded. Such a practice is contrary to both the spirit and the letter of our Workmen's Compensation Law. In *Wardwell D. Cox's Case,* 225 Mass. 220, 225 114 N. E. 281, 283, it is said:

"If an employer becomes a subscriber he becomes a subscriber for all purposes as to all branches of one business with respect to all those in his service under any contract of hire. All the terms of the act are framed upon the basis that the employer is either wholly within or altogether outside its operation. There is no suggestion or phrase warranting the inference that there can be a divided or partial insurance.

"The practical administration of the act renders it highly desirable that a single rule of liability should apply throughout any single business. Otherwise difficult and troublesome questions often might arise as to liability or nonliability dependent upon classifications of employees and scope of their duties. Litigation as to the line of demarcation between those protected by the act and those not entitled to its benefits would be almost inevitable. Instead of being simple, plain and prompt in its operation, such division of insurance would promote complications, doubts and delays."

The doctrine announced in that case is in accord with sound legal principles and calculated to defeat any attempt to nullify or limit the operation of the law. To permit an

insurance carrier to exclude from the coverage of a workman a part of the hazard incident to conducting ■ a business is contrary to public policy. Such attempted exclusion in an insurance policy is invalid as to an injured workman, and in case of death as to his dependents. Other authorities which support such view are 28 R. C. L. 737, § 32; *Employers' Indemnity Corporation* v. *Felter* (Tex. Civ. App.) 264 S. W. 137; *Janes Contracting Co.* v. *Home Life & Accident Company* (Tex. Civ. App.) 245 S. W. 1004; *First National Trust & Savings Bank* v. *Industrial Accident Commission*, 213 Cal. 322, 2 P. (2d) 347, 78 A. L. R. 1324.

It is a matter of common knowledge of which we may take judicial notice that the "shooting of wells" is an incident to drilling for oil. The insurance carrier evidently knew that the "shooting of wells" is a common practice in the development of oil wells; otherwise there would have ■■ been no occasion to attempt to exclude that hazard from the policy here brought in question. A workman has a right to assume that he is given coverage for all of the hazards incident to the business in which he is regularly employed. The rule is thus stated in the case of *Harding* v. *Industrial Commission*, 83 Utah 376, 28 P. (2d) 182, 185, 91 A. L. R. 1523:

"An employee injured while performing an act which is fairly incident to the prosecution of the business, trade, or occupation of the employer and appropriate in carrying it forward and providing for its needs, is not to be barred from the benefits of compensation because the act is not wholly embraced in the precise and characterization process or operation made the basis of the group in which employment is claimed. *Anderson* v. *Last Chance Ranch Co.*, 63 Utah 551, 228 P. 184, 186; *Matter of Larsen* v. *Paine Drug Co.*, 218 N. Y. 252, 112 N. E. 725."

From what has been said it follows that the provision of the policy excluding from its coverage the "shooting of wells," while binding upon the parties thereto, does ■ not preclude plaintiffs from recovering compensation from the assured and the State Insurance Fund.

Little need be said concerning the release which was signed by Mrs. Empey. In any event, the release is not binding upon, and does not purport to bind, the minor children of Mr. Empey. Defendants do not contend that it does. Mrs. Empey testified that she was induced to sign the release upon the representation and promise that the signing thereof would not affect her right to compensation. Up to the time of the trial the stock had not been delivered. There is no finding and no evidence as to the value of the stock, nor is there any finding as to whether or not the signature of Mrs. Empey to the release was secured by the representations which she claims were made to her. If the signing of the release is to be determinative of the claim of Mrs. Empey to compensation, doubtless the commission will desire further information with respect thereto. Clearly, in the absence of a delivery, or at least a tender of delivery, of the stock to Mrs. Empey, she is not bound by the release.

The orders denying compensation to plaintiffs herein are annulled. These causes are remanded to the commission for such further proceeding not inconsistent herewith as may be deemed proper. Plaintiffs are awarded their costs on this review.

FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

WOLFE, Justice (concurring).

I concur. I do not know whether, in principle, the case of *Continental Casualty Co.* v. *Industrial Commission* is distinguishable from this case but, regardless, I think it good law that when an insurance company definitely intends to cover certain operations and whatever workmen are therein engaged, and those working in such operations are led to believe they are insured, the principle of estoppel should be invoked to prevent the insurance company from asserting that it did not insure the employer engaging those men and performing those operations unless the insurer can show

good reasons why estoppel should not be invoked. If the injured or killed workmen in this case were actually employees of the Arrowhead Company, the State Insurance Fund will be estopped from asserting, as between the employer and the fund, that they were not the employees of the Escalante Company.

I also agree that the State Insurance Fund could not exclude "shooting of wells." Besides the reasons given by the prevailing opinion, section 43-3-37, R. S. Utah 1933, provides in part:

"Every policy of insurance covering the liability of an employer for compensation shall cover the entire liability of the employer to his employees under the title Industrial Commission, covered by the policy or contract," etc.

I think the word "liability" here includes obligation for all compensation. It would be difficult to give it any other meaning. And the words "entire liability" mean not only the entire monetary liability to each injured employee, but the entire horizontal liability extending over all the operations of the particular industry insured. Respondent argues that if we do not give effect to the exclusion clause section 43-3-37 is meaningless. I think it is so meaningful that it excludes the exclusion clause of the policy. Thus the law expressed what the policy should cover, and the insurance company could no more exempt itself from any of the liability of the employer than could the surety in the case of *Beaver County* v. *Home Indemnity Co.*, 88 Utah 1, 52 P. (2d) 435, in the bond exempt itself from liability for the county treasurer's failure to safekeep public money where the failure arose from a defunct depository of the funds.